OPINION OF THE COURT
Eileen Bransten, J.
Motion sequence numbers 60 and 61 are consolidated for disposition.
This matter comes before the court on the summary judgment motions submitted by MBIA Insurance Corporation and Bank of America Corp. (BAG). Each motion seeks summary judgment under CPLR 3212 (e) on MBIA’s successor liability claim under the theories of de facto merger and assumption of liabilities. Each theory will be addressed in turn.
For the reasons that follow, MBIA and BAC’s motions are denied.
I, Background
The facts of this matter have been discussed extensively in previous decisions of this court. Thus, only details necessary to the instant motions are referenced herein.
MBIA brought this action on September 30, 2008 against the Countrywide defendants.[1] MBIA alleges that Countrywide fraudulently induced MBIA to insure 15 residential mortgage-backed securitizations and that Countrywide breached the representations and warranties in the transaction documents related to the securitizations. On August 24, 2009, MBIA filed an amended complaint. The amended complaint added, among *647 other things, a cause of action alleging successor liability against BAC. This successor liability claim for Countrywide’s alleged liabilities is premised on a series of transactions entered into by BAC and the Countrywide defendants in 2008.
A. Transactions between BAC and the Countrywide Defendants
On January 11, 2008, BAC agreed to acquire Countrywide Financial Corporation through a forward triangular merger, whereby CFC merged into BAC’s wholly-owned subsidiary, Red Oak Merger Corporation. (BAC statement of undisputed material facts under rule 19-a [BAC 19-a statement] 1i 24.)[2] Before the merger closed, CFC was a holding company whose subsidiaries were primarily engaged in mortgage origination and servicing, banking, capital markets, and insurance businesses. (MBIA rule 19-a statement of undisputed material facts [MBIA 19-a statement] II 6.) At that time, CFC’s direct and indirect subsidiaries included Countrywide Home Loans, Countrywide Home Loans Servicing, and Countrywide Capital Markets, Inc., which in turn owned Countrywide Securities Corporation. (MBIA 19-a statement 11 7.)
When the Red Oak merger closed on July 1, 2008, Red Oak Merger Corporation was renamed Countrywide Financial Corporation. (BAC 19-a statement II 30.) As consideration for the Red Oak merger, CFC’s shareholders received BAC stock. (BAC 19-a statement H 27.)
Immediately following the July 1, 2008 Red Oak merger— between July 1 and 3, 2008 — certain CFC subsidiaries, CHL and CSC, sold assets to BAC subsidiaries. (MBIA 19-a statement HH 70-71, 78, 87-89.) These asset sales to BAC subsidiaries were done “[t]o support Bank of America Corporation’s (‘BAC’) strategic model for the residential mortgage business and to provide efficiency in [BAC’s] funding and liquidity plans.” (BAC responses to MBIA rule 19-a statement of undisputed material facts [BAC Resp. to MBIA 19-a statement] 1141.)[3]
The July 2008 transactions were followed by additional asset sales on November 7, 2008. The November 2008 transactions included the sale to BAC of “substantially all of CFC and CHL’s *648 remaining assets.” (MBIA 19-a statement 11105.) These transactions were effectuated through a stock purchase agreement, by which BAG purchased from CFG its 100% equity ownership of Effinity Financial Corp. (BAG 19-a statement 1i 120), and an asset purchase agreement, through which BAG purchased substantially all of CHL’s remaining assets. (BAG 19-a statement If 132.)
MBIA maintains that the July 2008 and November 2008 transactions were part of a plan developed by BAG before the closing of the Red Oak merger. MBIA contends that following the announcement of the proposed Red Oak merger on January 11, 2008, BAG planned to integrate and transition Countrywide’s businesses into BAC’s business through a series of transactions by which BAG would acquire control over, and then transfer, all of Countrywide’s productive assets, operations and employees to itself. (MBIA 19-a statement 1f 38.) MBIA refers to this as the “Integration Plan” and points to Bank of America documents that predate the closing of the Red Oak merger and discuss BAC’s plan to “[mjerge CFG into Red Oak and then assets out of Red Oak and into BofA” to “provide[ ] a filter for assets and liabilities.” (Affirmation of Jonathan B. Oblak in support of MBIA’s motion for summary judgment [Oblak affirmation], exhibit 18 at BACMBIA-X0000018074.)
BAG disputes that the July 2008 and November 2008 transactions were part of any “Integration Plan” and urges the court to look at these two asset sales as distinct from the de jure Red Oak merger. BAG disputes that the use of “BAG” in the documents highlighted by MBIA shows “any effort to combine BAG and Countrywide’s business operations.” (BAG Resp. to MBIA 19-a statement H 47.) Instead, BAG points to deposition testimony stating that BAG was used “genetically” to refer to the Bank of America group of companies. (Id.)
II. Analysis
Although “[i]t is the general rule that a corporation which acquires the assets of another is not liable for the torts of its predecessor” (Schumacher v Richards Shear Co., 59 NY2d 239, 244-245 [1983]), a corporation may be held liable for the torts of its predecessor if (1) there was a consolidation or merger of seller and purchaser, (2) it expressly or impliedly assumed the predecessor’s tort liability, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations. (Id. at 245.)
*649 MBIA grounds its successor liability claim in the first and second of these exceptions: (1) that there was a de facto merger between BAG and the Countrywide defendants and (2) that BAG impliedly assumed the Countrywide defendants’ liabilities.[4] BAG and MBIA each seek summary judgment on MBIA’s successor liability claim.
A. Summary Judgment Standard
A party moving for summary judgment is required to make a prima facie showing that it is entitled to judgment as a matter of law by providing sufficient evidence to eliminate any material issues of fact from the case. (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985].) Failure to make such a showing mandates denial of the motion, notwithstanding the sufficiency of the opposition. (Id.) If there is a prima facie showing, the party opposing must then demonstrate the existence of a factual issue requiring a trial of the action. (Zuckerman v City of New York, 49 NY2d 557, 562 [1980].)
“It is axiomatic that summary judgment is a drastic remedy which should not be granted where there is any doubt as to the existence of a triable issue of fact or where such issue is even arguable.” (Tronlone v Lac d’Amiante Du Quebec, 297 AD2d 528, 528-529 [1st Dept 2002] [citation omitted].) The summary process “classically and necessarily requires that the issues be first exposed and delineated” since “[i]ssue-finding, rather than issue-determination, is the key.” (Id.)
B. De Facto Merger
MBIA asserts that the Red Oak merger, coupled with the July and November 2008 transactions, amounted to a de facto merger of BAG and the Countrywide defendants, and that accordingly, BAG is liable for the breach of contract and fraud claims asserted by MBIA against Countrywide. BAG maintains that this claim fails as a matter of law because there was no de facto merger, rendering successor liability inapplicable. For the reasons that follow, neither BAG nor MBIA is entitled to summary judgment on the de facto merger claim under New York law.
*650 1. Choice of Law
The threshold issue for the de facto merger analysis is choice of law. While BAG asserts that Delaware law governs, MBIA contends that New York law is applicable. After consideration of the relevant factors, MBIA’s de facto merger claim is properly governed by New York law.
i. New York Choice of Law — Determination of Whether an Actual Conflict Exists
Since New York is the forum state, New York choice of law rules are applicable. (Padula v Lilarn Props. Corp., 84 NY2d 519, 521 [1994].) “The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.” (Matter of Allstate Ins. Co. [Stolarz — New Jersey Mfrs. Ins. Co.], 81 NY2d 219, 223 [1993].) Laws are in conflict “[w]here the applicable law from each jurisdiction provides different substantive rules.” (International Bus. Machs. Corp. v Liberty Mut. Ins. Co., 363 F3d 137, 143 [2d Cir 2004]; see also Elson v Defren, 283 AD2d 109, 115 [1st Dept 2001] [finding no “meaningful conflict” between New York and Idaho laws with respect to vicarious liability].) The differences must be “relevant” to the issue before the court. (Finance One Pub. Co. Ltd. v Lehman Bros. Special Fin., Inc., 414 F3d 325, 331 [2d Cir 2005] [applying New York choice of law rules], quoting Tronlone v Lac d'Amiante Du Quebec, 297 AD2d 528 [1st Dept 2002].) “In the absence of substantive difference . . . a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it.” (Harbinger Capital Partners Master Fund I, Ltd. v Wachovia Capital Mkts., LLC, 27 Misc 3d 1236[A], 2010 NY Slip Op 51046[U], *11 [Sup Ct, NY County 2010], quoting International Bus. Machs. Corp. v Liberty Mut. Ins. Co., 363 F3d 137, 143 [2d Cir 2004].)
The burden is on the party asserting a conflict — here, BAG — to demonstrate its existence. (Portanova v Trump Taj Mahal Assoc., 270 AD2d 757, 759-760 [3d Dept 2000] [“(Plaintiffs have failed to establish the existence of any conflict between the legal principles stated herein and the applicable law of New Jersey ... As a consequence, we need not engage in any choice of law analysis”]; see also Ackerman v Price Waterhouse, 252 AD2d 179, 194 [1st Dept 1998] [concluding that movant failed to meet burden of demonstrating that its proposed choice of law should be applied].)
*651 MBIA asserts that there is no conflict between North Carolina and New York law with regard to de facto merger. This statement is not opposed by BAG. (BAG reply mem in further support of its motion for summary judgment [BAG reply brief] at 4.)[5] Thus, there is no showing of actual conflict between New York and North Carolina law and no need to engage in an interest analysis as between the two states.
BAG contends that Delaware de facto merger law is in conflict with New York. Specifically, BAG argues that Delaware, unlike New York, looks to the existence of a statutory violation to assess a de facto merger claim. MBIA disputes this, contending that Delaware courts consider statutory violations only in the context of suits brought by shareholders and not in suits, like the instant action, involving creditors. Accordingly, without the statutory violation element, MBIA maintains that New York law is in line with Delaware.
Here, as discussed below, BAG points to no “meaningful conflict” between Delaware and New York with regard to the de facto merger claim.
Delaware takes a holistic view of the transaction in weighing de facto merger, emphasizing that “[w]hether a particular transaction is in reality a merger or otherwise depends to a great extent on the circumstances surrounding each particular case and in determining the question all elements of the transaction must be considered.” (Fidanque v American Maracaibo Co., 33 Del Ch 262, 269, 92 A2d 311, 315-316 [1952].) New York takes a similarly broad view, analyzing the “four hallmarks” of de facto merger “in a flexible manner that disregards mere questions of form and asks whether, in substance, it was the intent of the successor to absorb and continue the operation of the predecessor.” (Matter of AT&S Transp., LLC v Odyssey Logistics & Tech. Corp., 22 AD3d 750, 752 [2d Dept 2005]; see also Sweatland v Park Corp., 181 AD2d 243, 246 [4th Dept 1992] [noting that public policy considerations require that “courts have flexibility in determining whether a transaction constitutes a de facto merger”]; cf. International Flavors & Fragrances, Inc. v St. Paul Protective Ins. Co., 98 AD3d 854, 855 [1st Dept 2012] [finding conflict between “rigorous” Illinois four-factor de facto merger analysis and New York’s “flexible” approach].)
*652 While certain Delaware courts have considered statutory compliance as part of the “circumstances” surrounding the transaction, not all Delaware courts have. Some courts weighing creditor claims have referenced — although not held dispositive — whether the asset sale complies with Delaware’s asset sale statute (Del Code Ann tit 8, § 271; see Drug, Inc. v Hunt, 35 Del 339, 168 A 87 [1933]), while other courts have considered de facto merger claims in creditor cases without reference to the statute. (See Xperex Corp. v Viasystems Tech. Corp., LLC, 2004 WL 3053649, *2, 2004 Del Ch LEXIS 172, *4-7 [Del Ch, July 22, 2004, Civ. action No. 20582-NC]; Magnolia’s at Bethany, LLC v Artesian Consulting Engrs., Inc., 2011 WL 4826106, *3, 2011 Del Super LEXIS 435, *8-11 [Sept. 19, 2011, C.A. No. S11 C-04-013-ESB]).
Further, BAG points to no authority for the proposition that compliance with the asset sale statute is a requisite element for de facto merger claims under Delaware law. BAG cites to only two Delaware cases, Hariton v Arco Elecs., Inc. and Heilbrunn v Sun Chem. Corp., to support its argument that statutory compliance is an element of Delaware’s analysis. Both of these cases were brought by shareholders dissenting from an asset sale who sought to avail themselves of the statutory remedy of appraisal that was provided under the Delaware merger statute but not under section 271. (Hariton v Arco Elecs., 40 Del Ch 326, 182 A2d 22 [1962]; Heilbrunn v Sun Chem. Corp., 38 Del Ch 321, 150 A2d 755 [1959].) The Supreme Court of Delaware in each of these cases refused to recognize the transaction at issue as a de facto merger for this purpose and denied plaintiffs’ appraisal request. Given the nature of the claim and the remedy sought, the inquiry in both Hariton and Heilbrunn necessarily focused on whether the transaction complied with the asset sale statute because, if so, plaintiffs had no right to the damages sought. While compliance with statutory formalities was a relevant inquiry in those analyses, it is not relevant to the instant analysis, where the claim is not brought by dissenting shareholders and the remedy sought is not appraisal. Nor does the instant claim attack the validity of the transaction under the asset sale statute. Thus, it does not appear that statutory compliance is a relevant factor — or even a factor — in the de facto merger claim as presented in this case. Since this is the only conflict asserted *653 by BAG, it does not appear that there is a meaningful conflict between New York and Delaware.[6]
ii. New York Choice of Law — Interest Analysis
Even if there were a conflict, New York law still would apply. If an actual conflict existed, the court then would consider which jurisdiction, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation, an analysis often called “interest analysis.” (K.T. v Dash, 37 AD3d 107, 111 [1st Dept 2006] [internal quotation marks omitted].) Under the facts of this case, the interest analysis favors North Carolina, and thus, New York law.
Since MBIA asserts successor liability against BAG for the transactions at issue, the relevant entity for the interest analysis is BAG. (Schultz v Boy Scouts of Am., 65 NY2d 189, 197 [1985] [the court’s required interest analysis must particularly focus on, and then apply, “(t)he law of the jurisdiction having the greatest interest in the litigation . . . and . . . the (only) facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict”]; cf. Serio v Ardra Ins. Co., 304 AD2d 362, 362 [1st Dept 2003] [considering contacts of defendant Ardra Ins. Co. in determining choice of law for veil piercing claim brought against Ardra].) MBIA asserts its own contacts as part of its conflicts analysis, and BAG asserts contacts for CHL in its papers. Since choice of law questions are decided on an issue-by-issue basis (Cooney v Osgood Mach., 81 NY2d 66, 72 [1993]), the interest analysis for the de facto merger claim centers on *654 the transactions giving rise to the potential successor liability. Thus, MBIA’s contacts with CHL as they pertain to the primary liability claims asserted are not germane to the conflicts analysis as to its successor claim. In addition, CHL’s contacts — as well as the contacts for the other Countrywide subsidiaries that were parties to the July and November 2008 transactions — are likewise not significant in the conflicts analysis, since the liability of the asset sellers is not at issue in the successor claims.
Here, BAG cites to its state of incorporation — Delaware. However, aside from its incorporation in Delaware, BAG asserts no other ties to that jurisdiction. (See UBS Sec. LLC v Highland Capital Mgt., L.P., 30 Misc 3d 1230[A], 2011 NY Slip Op 50297[U], *3 [Sup Ct, NY County, Mar. 1, 2011, Fried, J.] [rejecting argument that law of the place of incorporation is applicable to veil piercing claim because “(o)ther than being incorporated in the Cayman Islands, SOHC has no obvious ties to that jurisdiction”], affd 93 AD3d 489 [1st Dept 2012].)
BAG instead contends that Restatement (Second) of Conflict of Laws § 302 supplants New York’s traditional interest analysis and renders state of incorporation the most significant interest. However, BAG cites to no New York State case law supporting this categorical disregard of the interest test.[7] Instead, BAC’s state of incorporation is a contact under New York’s interest analysis but it is not the only relevant contact.
Section 302, provides that the law of the state of incorporation governs certain matters “peculiar to corporations and other associations” (Comment a) except where, “with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties.” (§ 302 [2].) As the comments explain, “[m]any of the matters that fall within the scope of the rule of this Section involve the ‘internal affairs’ of a corporation — that is the relations inter se of the corporation, its shareholders, directors, officers or agents.” (Comment a.)
Consistent with Comment a, to the extent that New York courts have considered section 302 in conducting interest *655 analyses, courts have found it applicable to conflict of law issues pertaining to shareholder disputes. (See Zion v Kurtz, 50 NY2d 92, 100 [1980] [applying law of the state of incorporation in shareholder dispute alleging corporation’s violation of shareholders’ agreement and noting “that is the generally accepted choice-of-law rule with respect to such ‘internal affairs’ as the relationship between shareholders and directors”]; Hart v General Motors Corp., 129 AD2d 179, 183-184 [1st Dept 1987] [citing “internal affairs doctrine” and applying law of the state of incorporation in shareholder derivative action against corporation and directors challenging board authorization of stock purchase]; Greenspun v Lindley, 44 AD2d 20, 22 [1st Dept 1974], affd 36 NY2d 473 [1975] [applying law of incorporation state in vetting demand requirement in shareholder derivative suit]; Sokol v Ventures Educ. Sys. Corp., 10 Misc 3d 1055[A], 2005 NY Slip Op 51963[U], *5 [Sup Ct, NY County, June 27, 2005] [applying law of incorporation state to dispute regarding minority shareholder rights].)
In the one case not involving a shareholder dispute in which the Restatement was considered by a New York court, the court found section 302 inapplicable, noting that “the courts of this state do not automatically apply the ‘internal affairs’ choice-of-law rule.” (UBS Sec. LLC v Highland Capital Mgt., L.P., 30 Misc 3d 1230[A], 2011 NY Slip Op 50297[U], *3 [Sup Ct, NY County, Mar. 1, 2011] [rejecting assertion that Restatement § 302 dictated choice of law in dispute involving third-party creditor claim alleging abuse of corporate form, citing Greenspun v Lindley, 36 NY2d 473, 478 (1975)], mod 93 AD3d 489 [1st Dept, Mar. 13, 2012].)
Since determination of whether BAG is successor to the Countrywide defendants at issue here is not a “matter[ ] peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders” (UBS Sec. LLC, 30 Misc 3d 1230[A], 2011 NY Slip Op 50297[U], *3), no rigid application of the “internal affairs” rule is appropriate to the instant successor liability claim. Instead, the traditional New York State interest analysis governs.
For conflicts purposes under New York law, it is the parties’ domiciles — and not the state of incorporation — that typically governs. As the First Department explained, for the purpose of the interest analysis, “the significant contacts are, almost exclusively, the parties’ domiciles and the locus of the tort.” (Elson v Defren, 283 AD2d 109, 115 [1st Dept 2001].)
*656 As discussed above, MBIA notes that BAG is both headquartered and has its principal place of business in Charlotte, North Carolina. (Affirmation of Renee B. Bea in opposition to BAC’s motion for summary judgment [Bea affirmation], exhibit 32.) Thus, under New York conflict of law principles, BAG is domiciled in North Carolina. (See Elson, 283 AD2d at 116 [finding defendant to be a New York domiciliary despite its incorporation in Delaware since “it maintains its principal place of business in New York and is therefore considered a New York domiciliary for choice of law purposes”]; Weisberg v Layne-New York Co., 132 AD2d 550, 551-552 [2d Dept 1987] [“While the defendant is a New York domiciliary by virtue of its having incorporated in New York, for choice-of-law purposes, it must be treated as a New Jersey entity inasmuch as it maintains its principal place of business in that State and thus, it may be said that its corporate presence is much more pronounced in that State than in either New York or New Hampshire” (citation omitted)].)
The “locus of the tort” for the successor liability claim is not established by the parties. BAG makes no argument on this point, and while MBIA urges the court to look to where its primary liability allegations arose (see MBIA moving brief at 23), the fraud and breach of contract claims asserted by MBIA are not at issue on this successor liability claim. Thus, the court is left with little at which to look to ascertain the locus of the successor liability claim, which most appropriately appears to be where the transactions at issue occurred.[8]
The inquiry therefore distills down to whether New York, North Carolina, or Delaware has the most significant contacts. As noted above, the “most significant contacts” are the parties’ domiciles and the locus of the tort. Since the parties have not identified the situs of the tort, the court is left to look at the domicile asserted — North Carolina. While the court notes that BAG is incorporated in Delaware, the significance of BAC’s domicile in North Carolina carries the most weight. Accordingly, the *657 parties agree that North Carolina law does not conflict with New York law. Thus, New York law applies.
2. Application of New York Law
New York law recognizes de facto merger “when a transaction, although not in form a merger, is in substance a consolidation or merger of seller and purchaser.” (Cargo Partner AG v Albatrans, Inc., 352 F3d 41, 45 [2d Cir 2003] [internal quotation marks omitted].)[9] A de facto merger occurs “when the acquiring corporation has not purchased another corporation merely for the purpose of holding it as a subsidiary, but rather has effectively merged with the acquired corporation.” (Fitzgerald v Fahnestock & Co., 286 AD2d 573, 574 [1st Dept 2001].) Underlying the de facto merger doctrine is the concept that “a successor that effectively takes over a company in its entirety should carry the predecessor’s liabilities as a concomitant to the benefits it derives from the good will purchased.” (Id. at 575.) De facto merger is aimed at avoiding the “patent injustice which might befall a party simply because a merger has been called something else.” (Cargo Partner AG, 352 F3d at 46.)
The four “hallmarks” of de facto merger under New York law include: (1) continuity of ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the successor of liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) continuity of management, personnel, physical location, assets and general business operation. (Id.) A finding of de facto merger does not “necessarily require” the presence of each factor. (Matter of New York City Asbestos Litig., 15 AD3d 254, 256 [1st Dept 2005], citing Fitzgerald, 286 AD2d at 574.) Instead, “[t]hese factors are analyzed in a flexible manner that disregards mere questions of form and asks whether, in substance, it was the intent of the successor to absorb and continue the operation of the predecessor.” (AT&S Transp., 22 AD3d at 752.) Each factor will be considered in turn.
i. Continuity of Ownership
Under New York law, continuity of ownership “describes a situation where the parties to the transaction ‘become owners together of what formerly belonged to each.’ ” (Matter of New *658 York City Asbestos Litig., 15 AD3d at 256.) This hallmark has been deemed “essential” to a de facto merger finding, as ownership continuity “is the essence of a merger.” (Id. at 256, 258; Cargo Partner AG, 352 F3d at 47.)
BAG moves for summary judgment, asserting that MBIA cannot demonstrate this hallmark. BAG points to Matter of New York City Asbestos Litig., arguing that continuity requires “shareholders of the predecessor corporation [to] become direct or indirect shareholders of the successor corporation as the result of the successor’s purchase of the predecessor’s assets, as occurs in a stock-for-assets transaction.” (15 AD3d at 256 [emphasis added].) Thus, BAG asserts that MBIA cannot demonstrate ownership continuity since neither CFG, CHL, nor CSC became shareholders of BAG as a result of either the July or November 2008 transactions.
MBIA counters that the July and November 2008 transactions need not be viewed in isolation, and that a finding of ownership continuity does not hinge on the Countrywide entities gaining an equity interest in BAG as a result of both the July and November 2008 transactions. MBIA asserts that the “transaction” for the purpose of this de facto merger analysis includes the Red Oak merger and that the three transactions— the Red Oak merger and the July and November 2008 transactions — should be viewed jointly for the purpose of this analysis and that this joint view establishes ownership continuity. Further, MBIA argues that it need not show that each individual transaction was a stock-for-assets transaction.
a. Joint Consideration of the Red Oak Merger and the July and November 2008 Transactions
Before determining whether a formal stock-for-assets transaction must be shown for ownership continuity, the threshold issue is how the transactions are to be viewed — either separately as BAG urges or together. BAG points to no New York authority requiring that these transactions be considered separately or precluding their joint consideration, although it contends that Delaware’s doctrine of independent legal significance requires the July 2008 transactions and the November 2008 transaction to each be viewed in isolation. (BAG reply brief at 14-15.) Again, however, BAG cites to no New York case law employing this Delaware doctrine for this or any purpose.
Turning to the facts, there is no dispute that BAG used its own stock to acquire CFC’s stock in the Red Oak merger (BAG 19-a statement 1i 27; MBIA responses to BAC’s rule 19-a state *659 ment of undisputed facts [MBIA Resp. to BAG 19-a statement] 1! 27) or that the July and November 2008 transactions followed the July 2008 closing of the Red Oak merger.
BAG maintains that the form of these transactions — specifically, their timing and their kind — precludes the court from viewing the transactions together for ownership continuity purposes. However, New York courts have emphasized that “[t]he requirement of ownership continuity does not exalt form over substance.” (At Last Sportswear, Inc. v Newport News Holding Corp., 2010 NY Slip Op 32792[U], *7-8 [Sup Ct, NY County, Oct. 5, 2010], quoting Cargo Partner AG v Albatrans Inc., 207 F Supp 2d 86, 104 [SD NY 2002].)
In Fitzgerald, the First Department demonstrated this focus on substance over form, holding that de facto merger can be established where, like here, an asset buyer’s initial acquisition of seller’s stock was followed by seller’s transfer of its assets and liabilities to the buyer in exchange for nonstock consideration. (Fitzgerald, 286 AD2d at 575.) Other New York courts similarly have looked to multiple transactions jointly in finding continuity of ownership where asset sales were preceded by acquisition of the seller’s stock by the asset buyer. (See Arnold Graphics Indus., Inc. v Independent Agent Ctr., Inc., 775 F2d 38, 42 [2d Cir 1985] [finding de facto merger where asset buyer merged with seller a year before assets transferred from seller to buyer and noting “there is no requirement that all of the events that are necessary to a finding of de facto merger occur at the same time”].)
The facts of the instant transaction appear in line with Fitzgerald and the analysis of New York law in Arnold Graphics. In both cases, as here, there was a stock purchase whereby the alleged successor bought an entity and then later sold the entity’s assets to itself. Accordingly, for the purpose of the ownership continuity analysis, BAG has not demonstrated that the transactions here must be viewed separately, and the court agrees with MBIA’s position that they should instead be viewed together.
BAG disputes the relevance of Arnold Graphics and Fitzgerald, arguing that any comparison is inappropriate since the asset transfers in these cases were not for fair consideration. BAC’s focus on fair value in this context appears off-point. Neither the Arnold Graphics nor the Fitzgerald courts focused on whether fair value was paid in finding it appropriate to consider multiple transactions together for the de facto merger analysis. *660 Moreover, to the extent that consideration is mentioned, the Arnold Graphics court notes its irrelevance. (Arnold Graphics Indus., 775 F2d at 42-43 [“Whether or not, as ETC contends, mere cancellation of the IAC debt might have constituted adequate consideration for ETC’s acquisition of IAC’s assets, the fact remains that ETC repeatedly stated that it had assumed IAC’s liabilities as well”].)
b. Form of the Transactions and Ownership Continuity
Considering the transactions together, the next issue is whether the asset sales are required to be stock-for-asset transactions in order to satisfy ownership continuity. In factually analogous situations, New York courts have held that this is not the case — a transaction need not be a strict stock-for-assets sale in order for ownership continuity to exist. (Fitzgerald, 286 AD2d at 575; Arnold Graphics Indus., Inc., 775 F2d at 42; see also Ortiz v Green Bull, Inc., 2011 WL 5554522, **10, 2011 US Dist LEXIS 131601, *30 [ED NY, Nov. 14, 2011, No. 10 CV 3747 (ADS)(ETB)] [“Thus, although a continuity of ownership is ‘typically satisfied where the purchasing corporation pays for the acquired assets with shares of its own stock,’ a court can still find continuity of ownership where a corporation pays for the assets in cash” (citation omitted)].)
While BAG cites to a number of cases in which courts refused to find that asset-for-cash transactions satisfied ownership continuity (see BAG moving brief at 35-37 n, 107-112; BAG reply brief at 14), none of these cited cases involve the situation presented in this matter — a stock-for-stock transaction followed by an asset purchase. (See e.g. Jasper & Black, LLC v Carolina Pad Co., LLC, 2012 WL 413869, *8, 2012 US Dist LEXIS 16435, *22-25 [SD NY, Feb. 9, 2012, No. 10 Civ. 3562(LTS)(HBP)] [no continuity of ownership for alleged single-step transaction whereby Carolina Pad purchased assets from seller for cash]; Danstan Props. v Merex Corp., 2011 WL 135843, 2011 US Dist LEXIS 3285 [SD NY, Jan. 7, 2011, No. 09 Civ. 6137(RMB)(RLE)] [noting lack of ownership continuity where purchase agreement for single transaction at issue did not provide for transfer of stock for assets].)
BAG points to the following language in Matter of New York City Asbestos Litig. for the proposition that continuity of ownership requires a stock-for-assets transaction: “The first criterion, continuity of ownership, exists where the shareholders of the predecessor corporation become direct or indirect shareholders of the successor corporation as the result of the successor’s *661 purchase of the predecessor’s assets, as occurs in a stock-for-assets transaction.” (15 AD3d at 256 [emphasis added].) This language, however, provides just one example of how shareholders of a predecessor corporation could become “direct or indirect shareholders” of the successor corporation. The Matter of New York City Asbestos Litig. Court went on to explain that continuity could be found where “the parties to the transaction become owners together of what formerly belonged to each.” (Id. [internal quotation marks omitted], citing Cargo Partner AG v Albatrans, Inc., 352 F3d 41, 47 [2d Cir 2003].) In the Cargo Partner case, on which that Matter of New York City Asbestos Litig. statement relies, the court noted that continuity could be found where “continuity of stockholders” is established, including where “the buying corporation owned all of the selling corporation’s stock when the seller’s assets were transferred to it.” (Cargo Partner AG, 352 F3d at 47, citing Fitzgerald, 286 AD2d at 575.)
While the Matter of New York City Asbestos Litig. Court found ownership continuity lacking since neither the asset seller or any of its shareholders became a shareholder of the asset buyer, the instant facts are to the contrary. (15 AD3d at 256.) Here, as alleged in Fitzgerald, CFC shareholders became shareholders of BAG and continued to be so when the July and November 2008 transactions occurred.
To distinguish Fitzgerald, BAG argues that ownership continuity only can be shown where the asset seller engineers the transaction so to evade creditors while retaining ownership of the assets. (BAG reply brief at 12; BAG brief in opposition at 22.) This argument appears to be an attempt to graft a scienter requirement onto the ownership continuity analysis. In so doing, BAG conflates de facto merger with a separate and distinct basis for successor liability — fraud. A corporation may be held liable for the debts of its predecessor where “the transaction is entered into fraudulently to escape such obligations.” (Schumacher, 59 NY2d at 245.) However, that basis for successor liability is not at issue here. Instead, focusing solely on de facto merger, the court finds no basis in the case law to require a showing of the Countrywide defendants’ fraudulent intent for ownership continuity purposes.
For these reasons, BAC’s motion for summary judgment on MBIA’s de facto merger claim based on lack of ownership continuity is denied.
The court notes that MBIA likewise seeks summary judgment. Viewing all facts in the light most favorable to the non- *662 moving party, as required for the purpose of this summary judgment motion (Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012]), the court finds issues of fact precluding the granting of summary judgment in favor of MBIA.
Moreover, even if this court were to find that MBIA were entitled to a finding of ownership continuity, this finding would not be sufficient in and of itself to grant MBIA’s motion. Although Matter of New York City Asbestos Litig. counsels that a de facto merger finding does not “necessarily require the presence of each” hallmark (15 AD3d at 256), the satisfaction of one hallmark — even one as essential as ownership continuity— would not justify the granting of summary judgment in MBIA’s favor, particularly given the factual issues identified below. (See Cargo Partner AG, 352 F3d at 47 [“Continuity of ownership might not alone establish a de facto merger, but ... it is the substance of a merger”] [internal quotation marks omitted].)
ii. Cessation of Ordinary Business
The second hallmark of de facto merger under New York law is “cessation of ordinary business operations and the dissolution of the selling corporation as soon as possible after the transaction.” (Matter of New York City Asbestos Litig., 15 AD3d at 256.) The dissolution criterion “may be satisfied, notwithstanding the selling corporation’s continued formal existence, if that entity is shorn of its assets and has become, in essence, a shell.” (Id. at 257 [internal quotation marks omitted], citing Fitzgerald, 286 AD2d at 575.) A corporation is a mere “shell” where it is “incapable of doing business except through defendant [the alleged successor].” (Fitzgerald, 286 AD2d at 575.)
In support of its motion for summary judgment, BAG asserts that CFC and CHL were not rendered “empty shells” after the July and November 2008 transactions, as they continued to service loans, evaluate mortgage-repurchase claims, and defend litigation. (BAG moving brief at 40-41.) In addition, BAG maintains that CFC, CHL, and CSC continued to hold substantial assets. (Id.) However, in light of the disputed factual issues identified below, the court finds that neither party has shown that it is entitled to summary judgment.
a. Disputed Facts Regarding CFC and CHL’s Continued Operations
While BAG asserts that CFC and CHL had a continued existence after the transactions, there is a material issue of fact as to the extent of their operations. MBIA asserts that these enti *663 ties have “no operations.”[10] (See Oblak affirmation, exhibit 82 [Apr. 2011 mem noting that “CHL has no ongoing operations and is in a wind-down mode”], exhibit 212 [“index of FR Y-10 reportable entities on organization chart as of 10/31/08” document noting that “CFG and many of its subs continue to exist and will continue to exist. Most have been skinnied down and do not have active ongoing business nor do they have associates. I can’t say for certain that no employee is employed by any legal entity under CFG. If there are any, it would be small because there aren’t any active entities in that list”], exhibit 325 at BACMBIA-X0000150290 [Oct. 2008 email from a “Vice President, BofA Countrywide Transition” stating that “Countrywide Securities will wind down”].) BAG disputes that the Countrywide defendants have no operations and contests MBIA’s interpretation of the term “wind-down mode” (BAC Resp. to MBIA 19-a statement ¶ 171; see also Nov. 7, 2012 aff of Joseph Loevner ¶¶ 4-6 [discussing CHL’s repurchase of loans].)
Further, BAG asserts that CHL “services” loans; however, MBIA notes that CHL is not engaged in servicing and that those responsibilities were transferred to “Countrywide Home Loans Servicing, LP (which will change its name to BAG Home Loans Servicing L.R on 4.27[.08]).” (See Oblak affirmation, exhibit 212 [Oct. 2008 spreadsheet entitled “Countrywide Transition, Legal Entity List”].) Again, BAG relies, in part, upon CHL’s servicing of loans to show that CHL is not an “empty shell.” (See BAC 19-a statement ¶ 162; Rosenberg affirmation, exhibit 121.) Therefore, the issue of whether CHL services loans is a material fact in dispute by the parties.
Moreover, to the extent that CHL and CFG engage in any activities, MBIA asserts they are controlled by BAG, demonstrating that CHL and CFC are “incapable of doing business except through” BAG. (Fitzgerald, 286 AD2d at 575.) MBIA makes two principal arguments in this regard: (1) that BAG controls the repurchase process and (2) that BAG controls the resolution of litigation brought against the Countrywide defendants.
Turning to MBIA’s repurchase-related argument, MBIA argues that BAC’s approval is required before Countrywide may repurchase a mortgage loan at the behest of entities, such as MBIA. (See Oblak affirmation, exhibit 185 [Sept. 2008 email *664 from a Countrywide Bank employee re: MBIA status, discussing loans submitted for repurchase and suggesting that loans be put before a committee so that “BAG can make a go/no-go decision if they want”], exhibit 103 [deposition testimony of CHL senior vice-president stating that both Countrywide and Bank of America were required to approve repurchase requests and that “it would not be sufficient to approve a repurchase request if only the Countrywide individuals on (the repurchase) committee approved the repurchase request”].) BAG responds by pointing to other deposition testimony, stating that the repurchase committee referenced by MBIA made decisions “by consensus” and not at the direction of BAG. (See BAC Resp. to MBIA 19-a statement ¶ 178, citing to Oblak affirmation, exhibit 76 at 133:14-134:05.)
By way of another example, MBIA also asserts that BAG controls the repurchase evaluation process, again raising the issue of whether the Countrywide defendants are incapable of doing business except through BAG. (See Oblak affirmation, exhibit 288 at 1012:18-1013:18 [deposition testimony from the president and chief operating officer of CFG stating “BAG adopted a process for the monoline insurer repurchase demands where there was an additional step at the front end, namely through investor review, and an additional level of approval required at the back end, namely in the workout strategies group approval in order for BAG to repurchase a monoline loan”].) Further, MBIA contends that BAG controls the funding for repurchases. (See Oblak affirmation, exhibit 102 [July 2009 email from a legacy BAG employee directing that repurchase funds intended for MBIA be “short(ed)”].)
Again, BAG disputes MBIA’s contention that it controlled the funding for repurchases, arguing that requests were vetted by a repurchase oversight group comprised of both Countrywide and BAG employees. (See Rosenberg affirmation in opposition, exhibit 245.) Further, BAG notes that this BAC-Countrywide collaborative repurchase committee determined the monthly spending on repurchases, not BAG independently. (Id.; BAC Resp. to MBIA 19-a statement ¶ 182, citing Oblak affirmation, exhibit 248 at 932:16-23). Moreover, BAG asserts that CHL ultimately makes all “approved” repurchases. (See BAC brief in opposition at 28; aff of Joseph Loevner ¶ 4.)
MBIA next asserts that CFG, CHL, and CSC’s participation in litigation activities only underscores the Countrywide defendants’ inability to operate independently, since BAG participates *665 in — and funds the settlement and resolution of — litigation involving the Countrywide defendants. (See Oblak affirmation, exhibit 347 [October 2008 email from “Bank of America” employee stating “(a)s you know, we’ve been in negotiations with several state Attorneys General to reach an agreement on lawsuits brought against Countrywide Financial Corporation”], exhibit 117 at BACMBIA-L0000003643-44 [noting that BAG and its non-CFC subsidiaries contributed financially to the payment of CHL’s litigation settlement with Fannie Mae and Freddie Mac], exhibit 119 at CWMBIA0018539232 [Mar. 31, 2011 CFC selected consolidated financial information noting that BAG made a cash contribution to CFC, which in turn made a capital infusion to CHL, to resolve litigation brought by Assured Guaranty]; MBIA 19-a statement 1i 242 [discussing financing of the Syncora litigation settlement], citing Oblak affirmation, exhibit 121.)
Again, BAG disputes MBIA’s assertions, claiming that it did not have a role in the State Attorneys General settlement referenced in Oblak affirmation, exhibit 347. (See BAC Resp. to MBIA 19-a statement ¶ 235.) Further, BAG disputes that the capital infusion referenced in Oblak affirmation, exhibit 119 was used to fund CHL’s settlement of litigation with Assured Guaranty, and argues that the documents cited by MBIA to establish BAC’s role in this settlement refer to Bank of America genetically and not BAG specifically. (BAC Resp. to MBIA 19-a statement ¶ 237.)
Viewing these disputed facts again in the light most favorable to the non-moving party (Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012]), the court finds that each parties’ arguments raise competing inferences, precluding resolution in either party’s favor and rendering summary judgment inappropriate.
b. Disputed Facts Regarding CFC and CHL’s Assets
In further support of its motion for summary judgment, BAG asserts that CFC and CHL continue to hold substantial assets after the July and November 2008 transactions, demonstrating that they continue to exist in a meaningful way. The value of these assets, however, is another fact in dispute.
BAG points to the November 2008 asset purchase and stock purchase agreements entered into by CHL and CFC as demonstrative of the “substantial assets” left at the entities. (See Rosenberg affirmation, exhibit 98, schedule 2.2 [Nov. 7, 2008 asset purchase agreement between BAG and CHL]; Rosenberg affirmation, exhibit 87, schedule 2.3 [b] [Nov. 7, 2008 stock *666 purchase agreement between BAG and CFG].) BAG also highlights that in the November 2008 transactions, CFG retained 39% of the assets it still held before the transaction (totaling around $8 billion), while CHL retained 28% of its presale assets (equal to nearly $6.3 billion). (See Oblak affirmation, exhibit 206 at BACMBIA-X0000153927.) In addition, CSC continued to hold $288 million in assets. (See Rosenberg affirmation, exhibit 77.)
While the Matter of New York City Asbestos Litig. Court noted that retention of substantial assets cuts against a dissolution finding, MBIA disputes whether the Countrywide defendants’ remaining assets are, in fact, “substantial.” In Matter of New York City Asbestos Litig., the First Department identified eight categories of “substantial assets” retained by the asset seller post-transaction. Here, MBIA asserts that, following the asset sales, the Countrywide defendants were left only with those loans “too toxic” to sell, and that the BAC’s asserted valuation of these assets on this motion fails to account for their illiquid and “toxic” nature. (See Oblak affirmation, exhibit 63 [Apr. 2009 email from “Change Manager” stating “(i)n November our goal was to move all assets from CFG and CHL to BAG, fully cognizant that some investors would not grant consent and other loans were too toxic to move. So what is left at CHL are those loans that we could/would not move and they have to be left branded as is under Countrywide”], exhibit 56 at 280:6-12 [deposition testimony of same “Change Manager” for the BAC-Countrywide transition, stating that the goal with regard to CFG loans was “to sequester or to leave the subprime and distressed loans that were 60 days past due, ready to go into foreclosure, and leave them with the Countrywide name”].)
Further, MBIA contends that BAG overstates the value of CFG and CHL’s balance sheets assets, as BAG does not account for the Countrywide defendants’ remaining liabilities. MBIA points to balance sheets showing liabilities offsetting the value of the Countrywide defendants’ remaining purported assets. (See Rosenberg affirmation, exhibit 118 at X:178 & X:740 [showing $5.1 billion balance tied to offsetting $5.4 billion liability].) BAG responds that liabilities are not relevant to the cessation analysis, maintaining instead that only assets matter. However, where assets are paired with liabilities, their corresponding value is, by mathematical rules, diminished. Thus, to the extent that the court must weigh whether the assets remaining are “substantial,” it makes little sense to look at the assets in a *667 vacuum without considering whether — and to what extent— their values are reduced by correspondent liabilities.
Accordingly, there is an issue of fact regarding whether the assets remaining, given their purported kind and quality, qualify as “substantial” and whether, taken with the liabilities alleged to be held by the Countrywide defendants, the entities have been rendered “shells.”
Further, BAG notes that both CFG and CHL remain corporations “in good standing” where they are incorporated.[11] In light of the numerous pertinent factual issues discussed above, this is a fact worthy of note but not dispositive of the issue. As Fitzgerald made clear, “[s]o long as the acquired corporation is shorn of its assets and has become, in essence, a shell, legal dissolution is not necessary before a finding of a de facto merger will be made.” (286 AD2d at 575.)
For each of these issues, viewing all facts in the light most favorable to the non-moving party, as required for the purpose of this summary judgment motion (Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012]), the court finds issues of fact precluding the granting of summary judgment in favor of BAG. For the same reasons, the court also finds issues of fact precluding summary judgment in favor of MBIA.
iii. Continuity of Management, Personnel, Physical Location, Assets and General Business Operation
Under New York law, an additional hallmark of de facto merger is continuity of management, personnel, physical location, assets, and general business operation. (Kretzmer v Firesafe Prods. Corp., 24 AD3d 158, 159 [1st Dept 2005].)
BAC’s principal argument in favor of summary judgment centers on the placement of the Countrywide defendants’[12] remaining mortgage business — including managers, personnel, assets and operations — in BAC’s subsidiary, Bank of America, N.A. (BANA), instead of in BAC. BAC argues that it cannot “continue” the management of the Countrywide defendants since it does not currently hold these mortgage business assets.
*668 BAC’s argument urges the court to focus on form over substance. However, New York courts have emphasized that the de facto merger analysis requires just the opposite — a flexible analysis that “disregards mere questions of form and asks whether, in substance, it was the intent of the successor to absorb and continue the operation of the predecessor.” (Matter of AT&S Transp., LLC v Odyssey Logistics & Tech. Corp., 22 AD3d 750, 752 [2d Dept 2005].) Looking past the form of the transactions to their substance, the court finds that disputed issues of fact remain as to whether BAG continued the management, personnel, physical location, assets and general business operations of the Countrywide defendants.
Here, it is undisputed that through the November 2008 transactions, BAG itself acquired “substantially all of CFG and CHL’s remaining assets” under two agreements — an asset purchase agreement and a stock purchase agreement — to which BAG was a party. (MBIA 19-a statement U 105; Oblak affirmation, exhibits 48 & 301.) The “majority” of these assets were then transferred to BANA, while some stayed at BAG and others went to CHLS. (Oblak affirmation, exhibit 53; see also Oblak affirmation, exhibit 189 [Nov. 10, 2008 charter collapse bulletin stating “BAG immediately contributed those assets to Bank of America, N.A. (‘BANA’) with the mortgage servicing rights and related assets being contributed further into Countrywide Home Loans Servicing, Limited Partnership (Servicing LP)”]; BAG Resp. to MBIA 19-a statement 1Í123.)
Through the Red Oak merger, which closed on July 1, 2008, BAG acquired CFG. In the days following the Red Oak merger, CFG and its subsidiaries, now owned by BAG, sold assets to certain BAG subsidiaries, BANA and NB Holdings (the July 2008 transactions). There are disputed issues of fact regarding BAC’s involvement in the planning and execution of the July 2008 transactions, referred to internally by BAG as the legal day (LD) 1-3 transactions (BAG Resp to MBIA 19-a statement H 42). MBIA points to a BAG presentation for the proposition that BAG directed the LD 1-3 transactions. (See Oblak affirmation, exhibit 22 [July 2008 BAG presentation entitled “Countrywide Funding Strategy: Review of Legal Day 1-3 Activities” stating that “BAG sold at fair value certain assets from Countrywide Financial (‘CFG’) subsidiaries to NB Holdings Corporation (‘NBHC’) and subsequently contributed said assets to Bank of America, N.A. (‘BANA’)”].) BAG disputes that it “planned” or “carried out” the LD 1-3 transactions. (BAG Resp. to MBIA 19-a statement 11 93.)
*669 In assessing BAC’s argument and MBIA’s opposition, the court notes the dearth of case law addressing management continuity in this context. Here, MBIA cites to federal cases assessing de facto merger under the statutory framework of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), while BAG cites to veil piercing cases, arguing that a finding of management continuity would be tantamount to piercing the veil. Both arguments are inapposite and highlight the lack of developed case law in this area.
CERCLA promotes “broad remedial policies” that have led courts to “consider[ ] the traditional [de facto merger] doctrine in a somewhat more flexible manner.” (See State of New York v Westwood-Squibb Pharm. Co., Inc., 981 F Supp 768, 788 [WD NY 1997].) Accordingly, a de facto merger analysis under CERCLA appears to be guided by CERCLA’s broad policy aims, which are, of course, not present in the instant case.
In addition, BAG cites to no de facto merger cases applying a veil piercing analysis, nor has the court identified any applicable precedent. However, in the one case addressing this point, a federal district court found that no such veil piercing showing was required because de facto merger “emphasize[s] continuity over uniformity,” and therefore a “court need not formally disregard the corporate form to recognize the realities of the transaction that took place here.” (Miller v Forge Mench Partnership Ltd., 2005 WL 267551, *8, 2005 US Dist LEXIS 1524, *26 [SD NY, Feb. 2, 2005, No. 00 Civ. 4314(MBM)].)
Thus, that BAG and BAÑA are separate entities — parent and subsidiary — is a factor the court has taken into account. However, there are disputed facts in the record regarding the substance of the transaction and the integration of Countrywide’s assets. MBIA contends that BAC’s intent to integrate the Countrywide defendants’ assets with its own did not observe the formalities of any BANA separateness. MBIA points to BAG documents discussing the “integration of Countrywide.” (See Bea affirmation, exhibit 61 [May 20, 2009 “Bank of America/ Countrywide” transition presentation discussing the “integration of Countrywide” into “the already complex Bank of America infrastructure” and noting that the “combined entities began mobilizing resources (some 700 strong) from parts of the organization”]; Oblak affirmation, exhibit 20 [Bank of America-Countrywide transition employee deposition testimony noting that the “transition” entailed “taking everything, people, process and technology activities from two companies and blending *670 them to get to a target state”].) BAC disputes the existence of an “integration plan” for BAC and the Countrywide defendants’ assets. (BAC Resp. to MBIA rule 19-a statement ¶ 47) and maintains that the statements quoted above do not demonstrate BAC’s plan to integrate Countrywide’s assets (see id. ¶ 38). Further, BAC maintains that BANA conducts different activities than BAC. (See Sept. 28, 2012 aff of William Stokes ¶ 8.)
Given the facts of the instant case, particularly the disputed facts regarding BAC’s role in the transactions and its intent with regard to “integrating” the Countrywide defendants through the July and November 2008 transactions, the court cannot hold as a matter of law on summary judgment that BAC’s decision to transfer certain assets to BANA in and of itself precludes management continuity. (See Miller, 2005 WL 267551, *8, 2005 US Dist LEXIS 1524, *26.) The court heeds the exhortations to look at substance instead of being beholden to form. Viewing the substance of the transactions at issue here, the court finds disputed issues of fact as to management continuity, and such disputed issues are not rendered irrelevant by BAC’s decision to place certain assets in BANA.
a. Additional Disputed Issues of Fact as to Management Continuity
Moreover, BAG and MBIA raise additional disputed issues of fact that cannot be resolved at this time, precluding resolution in either party’s favor. BAG argues that it did not merely integrate and absorb the Countrywide defendants’ mortgage business; instead, it transitioned Countrywide’s business into a form “consistent with Bank of America’s consumer business model.” (BAC reply brief at 16, citing BAC brief in opposition at 29-33; see aff of Barbara Desoer ¶ 6.) MBIA contends that the Countrywide defendants’ assets were not incorporated into a new, different Bank of America business but that Bank of America continued Countrywide’s business via its “leading US mortgage platform.” (Oblak affirmation, exhibit 1 at BACMBIA-W0000001913, exhibit 13 at BACMBIA-H0000000125-26.) The characterization of the Countrywide defendants’ post-transaction businesses and the extent to which these operations were incorporated into or consistent with BAC’s business model are inherently factual disputes that are not amenable to summary judgment.
BAG also contends that the post-transaction mortgage business was not operated out of CFG and CHL’s former headquarters in Calabasas, California, while MBIA asserts that it was and *671 still is operated there. (See Oblak affirmation, exhibit 12 at BACMBIA-B0000018286, exhibit 322 at 277:22-278:06.) BAG maintains that Countrywide’s senior management was not part of the post-transition mortgage operations (Desoer aff 1Í1Í18-19), while MBIA contends that Bank of America retained many senior Countrywide managers. (See Bea affirmation, exhibit 15 at 29:6-9, 335:14-336:2 [deposition testimony of CFG chief operations officer stating that “the majority of (Countrywide) executive managing directors stayed on after the Bank of America transaction”].) These are relevant facts for management continuity analysis that again are not amenable to summary judgment.
Here, the dispute goes far beyond “[t]he mere hiring of some of the predecessor’s employees.” (Kretzmer, 24 AD3d at 159.)[13] Instead, the facts in dispute as to management continuity reach the types of business continued, as well as where and by whom that business was managed. Accordingly, considering these disputed facts in the light most favorable to the non-moving party, the court finds that each raise competing inferences, rendering summary judgment in either party’s favor inappropriate. Management continuity therefore remains an issue for trial.[14]
iv. Assumption of Liabilities Ordinarily Required to Continue Operations
The final of the de facto merger hallmarks requires “assumption by the successor of liabilities ordinarily necessary for *672 continuation of the predecessor’s business.” (Miller, 2005 WL 267551, *9, 2005 US Dist LEXIS 1524, *28.) There are few New York State cases defining the precise contours of this test; however, New York courts have looked to whether the buyer assumed the seller’s existing contracts, royalty obligations, or outstanding debts. (See Miller, 2005 WL 267551, *9, 2005 US Dist LEXIS 1524, *29-30, citing McDarren v Marvel Entertainment Group, Inc., 1995 WL 214482, *8, 1995 US Dist LEXIS 4649, *22 [SD NY, Apr. 11, 1995, No. 94 Civ. 0910 (LMM)]; see also Morales v City of New York, 18 Misc 3d 686, 693 [Sup Ct, Kings County 2007].)[15]
Here, the asset purchase agreement entered into between CHL and BAG on November 7, 2008 states that, among other things, BAG explicitly assumed: (1) “the costs of all employment and employee benefits-related liabilities and obligations that arise on or after [closing] that relate to any Transferred Employee [CHL employee]”; (2) “contract rights with third parties, including rights under real estate leases . . . vendor contracts, intellectual property licenses and other contracts related to the mortgage operations of CFC.” (Oblak affirmation, exhibit 48, § 5.5 and schedule 2.2.)
Further, MBIA asserts that BAG and its non-CFC subsidiaries assumed various third-party and vendor contracts and leases required for the operation of the Countrywide defendants’ mortgage business. (See Oblak affirmation, exhibit 212 at BACMBIA-C0000118128.0162 [BAC “Countrywide Transition— Legal Entity” spreadsheet discussing transfer of supplier contracts originally in CHL’s name to BAÑA and noting that BAG first identified “any agreements that would be at risk by leaving them in the name of the original contracting (collapsed) (CHL) party,” and “(i)n those cases (where there was a risk involved,) we simply used (BAÑA) ‘as successor in interest to’ (CHL) language in the preamble of the amendment. From a practical standpoint, we have not had a case yet where the supplier was not willing to continue to take our money to continue providing their product/services”], exhibit 296 [Nov. 12, 2008 email from “Change Manager,” subject “Charter Collapse Update,” noting that “(a) 11 owned facilities and leases moved”], exhibit 297 [Mar. 2009 email from “Change Manager” requesting list of all CFC and CHL leases assigned to BANA in Nov. 2008].)
*673 BAG argues in response that any liabilities were assumed by BANA, not BAG. As noted above, however, agreements governing November 2008 transactions were executed by BAG and there is an issue of fact regarding BAC’s involvement in the planning and direction of the July 2008 transactions. (See Point II.B.2.iii, supra.) Just as the court cannot hold as a matter of law that the placement of purchased assets in BANA precludes a finding of management continuity, likewise the court cannot hold that the assignment of leases and contracts to BANA prevents a finding of assumption of liabilities in the de facto merger context. Since there are disputed issues of fact regarding the role of BANA with respect to the transactions at issue, for the reasons discussed above, the court cannot find in favor of either party with respect to this hallmark of de facto merger.[16]
v. Additional Arguments
In addition to its arguments regarding the four de facto merger hallmarks above, BAG contends that MBIA’s successor liability claim fails as a matter of law, given BAC’s assertion that it paid “fair value” for the assets in the July and November 2008 transactions. As a result, BAG maintains that MBIA’s claims here amount to an attempt to secure a “windfall.” BAG does not point to any New York case law establishing that “fair value” or “fair consideration” is a defense to a claim of de facto merger, nor does BAG identify any cases in which courts analyzed the four well-hewn de facto merger hallmarks yet held that consideration trumped all.[17] Instead, BAG makes several unsupported assertions that courts do not impose successor liability where the asset purchaser pays valuable consideration that is used by the seller to pay creditors, since “obviously” the creditors suffer no harm. (BAG moving brief at 19; BAG reply brief at 3.)
The Cargo Partner dicta that BAG references is no more persuasive. In Cargo Partner, the court begins by noting that *674 through a typical asset sale, the amount paid will “ordinarily be available to satisfy . . . debts” and that “[s]o long as the buyer pays a bona fide, arms-length price for the assets, there is no unfairness to creditors” in limiting their recovery to those proceeds. (352 F3d at 45.) The court then goes on, however, to note that successor liability provides an exception to this general rule. (See Miller, 2005 WL 267551, *13, 2005 US Dist LEXIS 1524, *42 [analyzing same passage from Cargo Partner and noting that court “carved out an exception to its ‘windfall’ principle for a de facto merger”].) Here, the issue is whether two of those successor liability exceptions — de facto merger and assumption of liability — are viable in light of the evidentiary record. Whether payment of fair value in the ordinary course would result in “fairness” to creditors is collateral to the matter at bar, as demonstrated by the fact that BAG can point to no New York case law demonstrating that “fair value” is a “hallmark” considered in the de facto merger or assumption of liabilities analyses.
The principle underlying the de facto merger doctrine is that a purchaser cannot escape the assumption of liabilities ordinarily attendant with a merger by labeling the transaction something else. Whether fair value is paid for the assets acquired has no bearing on whether a New York court will look at a transaction or series of transactions and deem them “in substance a consolidation or merger of seller and purchaser.” (Cargo Partner AG, 352 F3d at 45 [internal quotation marks omitted].) Thus, BAC’s argument that its payment of “fair value” defeats MBIA’s successor liability claim fails.[18]
The de facto merger claim requires the court to analyze the four hallmarks discussed above in a flexible manner, disregarding “mere questions of form” and asking “whether, in substance, it was the intent of the successor to absorb and continue the operation of the predecessor.” (AT&S Transp., 22 AD3d at 752.) *675 Looking past the form of the transactions to their substance, the court notes that the parties have raised — and the court has identified — numerous factual issues in dispute as to the remaining hallmarks of de facto merger. In light of these factual issues, the court denies both parties’ motions for summary judgment as to de facto merger.
C. Assumption of Liabilities
As noted above, de facto merger is not the only circumstance that may render a corporation liable for the liabilities of its predecessor. In addition, a corporation may be held liable where it expressly or impliedly agreed to assume its predecessor’s liabilities. (Schumacher, 59 NY2d 239, 244-245.) “While no precise rule governs the finding of implied liability, the authorities suggest that the conduct or representations relied upon by the party asserting liability must indicate an intention on the part of the buyer to pay the debts of the seller.” (Ladjevardian v Laidlaw-Coggeshall, Inc., 431 F Supp 834, 839 [SD NY 1977].)
BAG first seeks summary judgment based on the express disclaimers of liability included in the November 2008 transactions’ purchase agreements. (See Rosenberg affirmation, exhibit 98 at schedule 2.4 [Nov. 7, 2008 asset purchase agreement between BAG and CHL], exhibit 87, § 1.2 and schedule 1.2 [a] [Nov. 7, 2008 stock purchase agreement between BAG and CFG].) Such express disclaimers can carry great weight, particularly as to a finding of express assumption of liabilities. CSee Wensing v Paris Indus.-N.Y., 158 AD2d 164, 166-167 [3d Dept 1990] [“These (liability disclaimer) provisions evince a clear intent that Leander was not assuming any liability for products sold prior to its acquisition of assets”]; see also Desclafani v Pave-Mark Corp., 2008 WL 3914881, *4, 2008 US Dist LEXIS 64672, *15 [SD NY, Aug. 22, 2008, No. 07 Civ. 4639 (HBP)] [noting that asset buyer “expressly did not assume and Pave-Mark expressly retained such liability under the APA”]; Peralta v WHM Tool Group, Inc., 2005 WL 2002454, *3, 2005 US Dist LEXIS 41755, *9-10 [ED NY, Aug. 19, 2005, No. CV 04 3826 CPS] [“With respect to the (assumption of liabilities) exception, defendant cannot be held to have expressly or impliedly assumed the predecessor’s . . . liability as to products sold prior to the asset purchase since it specifically disavowed such liability in the Asset Purchase Agreement”].)
However, where evidence is introduced demonstrating an intent by the asset buyer to pay the debts of the seller, express *676 disclaimers do not preclude a finding of implied assumption of liabilities. (Marenyi v Packard Press Corp., 1994 WL 16000129, *6, 1994 US Dist LEXIS 14190, *22 [SD NY, June 9, 1994, No. 90 CV 4439] [noting that express disclaimer does not preclude imposition of liability on asset purchaser where other facts and circumstances demonstrate buyer’s intent to pay seller’s debts].) Factors demonstrative of such an intent include: (1) admissions of liability by officers or other spokesmen of the buyer, as well as (2) the effect of the transfer upon creditors of the seller corporation. (Id.)
There are material facts in dispute as to both factors. By way of example, to demonstrate admissions of liability by BAG officers, MBIA points to statements by BAC’s current CEO, Brian Moynihan, stating that BAG “will pay for the things that Countrywide did,” will “stand up” and “clean it up,” as well as “when they were due . . . pay legitimate claims.” (Oblak affirmation, exhibit 105 at 1 [Nov. 10, 2010 Bloomberg article quoting Brian Moynihan], exhibit 294 at 7 [Dec. 11, 2010 New York Times article quoting Brian Moynihan], exhibit 96 at 146:2-147:14 [deposition of Brian Moynihan].) Further, MBIA points to statements by BAC’s CFO, made prior to the Red Oak merger, in which the CFO wrote that BAG “will not explicitly guarantee or assume the CFG debt” but its “intent at this time is to see that the debt is satisfied as it comes due.” (Oblak affirmation, exhibit 108 at 2.) BAG offers alternate explanations for Mr. Moynihan’s statements, offering, for example, that Moynihan’s “clean it up” statement refers to the “mortgage crisis” generally and not the assumption of the Countrywide defendants’ debt. (See BAG Resp. to MBIA rule 19-a statement 1i 225, citing Oblak affirmation, exhibit 96 at 106:23-25.) Moreover, BAG maintains that any discussion of paying Countrywide’s debts was not intended to be a wholesale assumption of all Countrywide debts. (See BAG Resp. to MBIA rule 19-a statement 11 230, citing Oblak affirmation, exhibit 26 at 224:18-225:21.) Viewing the evidence in the light most favorable to the non-moving party, both sides raise issues of fact in their respective summary judgment motions with regard to the meaning and import of statements, which are not amenable to resolution at this juncture.
Further, the effect of the transfer upon the Countrywide defendants’ creditors likewise raises issues of fact. As the Ladjevardian court explained, a “finding of an implied assumption is more likely” where the asset seller becomes a “mere shell” as a result of the sale, creating the “real possibility” that creditors *677 are “left without a remedy.” (431 F Supp at 839-840 [internal quotation marks omitted].) For the reasons discussed supra with regard to the cessation of ordinary business de facto merger hallmark, the court finds that there are questions of fact outstanding regarding whether the Countrywide defendants were rendered “shells” following the July and November 2008 transactions. BAG points to the consideration paid to the Countrywide defendants for the assets sold in these transactions, arguing that Countrywide’s creditors were not left without a remedy post-sale. As noted above, however, the value of the assets — and liabilities — remaining at CFG and CHL post-transaction is a factual issue disputed by the parties, rendering summary judgment on this point inappropriate.
BAG seeks to circumvent these factual issues by arguing that MBIA has failed to demonstrate its reliance on any BAG statements or conduct. BAG derives this reliance requirement from contract law, arguing that an implied assumption claim is “nothing more than a contract claim based on an asset buyer’s implied agreement to pay the asset seller’s liabilities.” (BAG moving brief at 45.) This novel contractual argument has facial appeal but no support in successor liability case law. This is likely because the implied assumption theory — and the successor liability doctrine generally — do not focus on the conduct of the third party bringing the successor liability claim. The focus instead is on the relationship between asset buyer and seller and the buyer’s post-acquisition conduct with respect to the assets. An examination of the third-party claimant’s reliance on the acts of the asset buyer is immaterial to this analysis.
While BAG points to Ladjevardian to support its attempt to graft a reliance requirement on the implied assumption analysis, the language of the case compels a finding to the contrary. In describing when implied assumption may be found, the Ladjevardian court noted the weight of authorities suggested that “the conduct or representations relied upon by the party asserting liability must indicate an intention” by the buyer to assume the seller’s debts. (431 F Supp at 839-840 [emphasis added].) BAG asserts that the use of “relied upon” in this sentence evinces the existence of a reliance requirement, notwithstanding that the court nowhere discusses or itself relies upon any showing of reliance. BAG makes much of the Ladjevardian court’s observation that the asset buyer sent a letter to all customers, including plaintiffs; however, the court points to that letter to demonstrate the buyer’s statement that it would *678 assume certain liabilities of the seller, i.e., customer credit and debit balances, not for the proposition that plaintiffs relied upon that letter. (Id. at 840.) Viewing this “relied upon” language in the context of the entire sentence — and the opinion as a whole — it is clear that it is interchangeable with “asserted” or “cited,” and does not create a reliance requirement. Thus, BAC’s attempt to impose a reliance requirement on MBIA using the language of Ladjevardian fails.
III. Conclusion
For the reasons noted above, both BAG and MBIA’s motions for summary judgment as to MBIA’s de facto merger claim are denied. In addition, the court finds issues of fact precluding summary judgment on MBIA’s implied assumption of liabilities claim.
Order
Accordingly, it is ordered that defendant Bank of America Corporation’s motion for summary judgment (motion sequence No. 60) is denied; and it is further ordered that plaintiff MBIA Insurance Corporation’s motion for summary judgment (motion sequence No. 61) is denied.

. The “Countrywide defendants” or “Countrywide” are Countrywide Home Loans, Inc. (CHL), Countrywide Securities Corporation (CSC), Countrywide Financial Corporation (CFG) and Countrywide Home Loans Servicing, LP (CHLS).

. Unless otherwise noted, all facts cited in this background section are unopposed.

. BAC notes that the document cited contains a note suggesting that the latter portion of this sentence — “to provide efficiency in [BAC’s] funding and liquidity plans” — be changed to “to assist in efficiency in funding and liquidity plans.” (BAC Resp. to MBIA 19-a statement 1Í 41.)

. In its moving brief, MBIA “reserves its right at trial to pursue successor liability under other exceptions.” (MBIA moving brief at 17 n 7.) Although BAG objects, arguing that MBIA never sought relief under such a theory, review of the amended complaint reveals that MBIA asserted a claim for successor liability generally, which encompasses the fraud theory at issue. (See Schumacher, 59 NY2d at 244-245.) MBIA was not required to seek summary judgment on this theory in order to preserve it for trial.

. During oral argument, BAG counsel noted that “North Carolina law actually is consistent with our view of New York law.” (Jan. 9, 2013 tr at 164:8-9.)

. Certain federal courts have found a conflict between Delaware and New York de facto merger law. One federal district court in the Southern District of New York identified a conflict based on the “continuity of ownership” element. (See Hayden Capital USA, LLC v Northstar Agri Indus., LLC, 2012 WL 1449257, *5-6, 2012 US Dist LEXIS 58881, *12-17 [SD NY, Apr. 23, 2012, No. 11 Civ. 594(DAB)] [finding that Delaware courts do not consider ownership continuity satisfied unless seller’s shareholders acquired a direct ownership interest in the successor corporation, while New York ownership continuity allows for “indirect” ownership].) Another court in the Central District of California noted a conflict, finding that Delaware requires an “inten[t] to commit fraud or otherwise harm the creditors” for a finding of de facto merger. (Allstate Ins. Co. v Countrywide Fin. Corp., 824 F Supp 2d 1164, 1171-1172 [CD Cal 2011].) However, BAG does not assert a conflict as to either the continuity of ownership or intent to defraud. For that reason, the court will not consider here whether a conflict exists on either basis, but notes that in any event, even if a conflict existed between New York and Delaware law on these points, the interest analysis favors the application of New York law.

. BAG points to a California federal district court opinion to support the application of section 302. In that case, Allstate Ins. Co. v Countrywide Fin. Corp., the District Court applied Delaware law to a de facto merger claim based on the defendant’s incorporation in Delaware. Applying New York conflict principles, the Allstate court noted that section 302 “is a logical extension of the interest analysis required under New York law.” (Allstate Ins. Co. v Countrywide Fin. Corp., 824 F Supp 2d 1164, 1172 [CD Cal 2011].) However, as the Allstate court conceded, “New York has not explicitly adopted § 302.” (Id.) For the reasons noted infra, this court declines the invitation to do so.

. The court notes as an aside that the agreements by which the November 2008 transactions were effectuated each selected New York as the governing law. (See Oblak affirmation, exhibit 48 [§ 10.1, asset purchase agreement], exhibit 301 [§ 9.6, stock purchase agreement], exhibits 58 & 60 [demand notes for November 2008 transactions], exhibit 31 [§ 11, master mortgage loan purchase and subservicing agreement].) While not a factor in this analysis, it is worthy of note that BAG voluntarily selected to have New York law govern the agreements constructing the November 2008 transactions.

. The federal cases cited in this section apply New York State law in their analyses.

. For each of the factual disputes referenced in this opinion, the documents cited are not intended to be an exhaustive list but instead were chosen as illustrative of the factual dispute.

. BAG also notes that “CSC’s business was shut down, not continued elsewhere.” (BAC reply brief at 20.) While BAG concedes that this entity has ceased ordinary business operations, it argues that CSC is not an empty shell because, as discussed above, it continues to hold assets and defend litigation.

. BAC makes no arguments as to CSC regarding its operation following the transactions at issue in this case. As such, BAC makes no arguments as to management continuity, or the lack thereof, with respect to CSC.

. Indeed, it appears that more than a “mere number” of the Countrywide defendants’ employees — almost half — went on to work for Bank of America subsidiaries after the transactions. (See Oblak affirmation, exhibit 10 [BAC’s first supplemental responses and objections to plaintiff’s interrogatories, supplemental responses to interrogatory No. 13].)

. In Matter of New York City Asbestos Litig., the First Department focused on the first two hallmarks of de facto merger — continuity of ownership and cessation of ordinary business — finding that management continuity, even if shown, would not be sufficient in and of itself to justify a finding of de facto merger. (15 AD3d at 258-259 [“Given the clear absence of the first two de facto merger factors, it does not avail plaintiff that the third factor (assumption of liabilities necessary for uninterrupted business operations) apparently is present, or that she may have raised an issue as to the presence of the fourth factor (continuity of management, personnel, physical location, assets and general business operation)”].) Accordingly, the court notes that management continuity, while a hallmark of de facto merger, appears to be of secondary importance to continuity of operations and cessation of ordinary business and further is not dispositive on its own. The same is true of the assumption of liabilities necessary for uninterrupted business operations prong. (See Point II.B.2.iv, infra.)

. This hallmark, assumption of liabilities ordinarily required to continue operations, is distinct from the separate assumption of liabilities theory of successor liability (see Point II.C, infra).

. BAC’s arguments as to CSC on this point are entirely derivative of its arguments as to cessation of business operations. Since summary judgment is denied as to the cessation of business operations hallmark as to CSC, it is likewise denied here.

. Indeed, as discussed above, to the extent that one court addressed the issue of consideration, it did so to note its irrelevance. (See Arnold Graphics Indus., 775 F2d at 42-43 [“Whether or not, as ETC contends, mere cancellation of the IAC debt might have constituted adequate consideration for ETC’s acquisition of IAC’s assets, the fact remains that ETC repeatedly stated that it had assumed IAC’s liabilities as well”].)

. Further, BAG notes several times in its papers that failure to grant it summary judgment here will “chill future corporate rescues, thereby thwarting all they provide in terms of liquidity to struggling companies and their creditors, and overall benefit to the nation’s economy.” (BAG brief in opposition at 50.) As noted throughout this opinion, for this set of summary judgment motions, the court is viewing all facts asserted in the light most favorable to the non-moving party to determine whether factual issues exist, requiring trial of the action. (See Vega, 18 NY3d at 503.) As with any set of summary judgment motions, this is a highly fact-intensive inquiry that is circumscribed by the circumstances of this case. To the extent that BAG invites the court to make broad policy pronouncements outside the confines of this matter, the court declines.