[827 NYS2d 112]

K.T., Respondent, v Damon Dash, Appellant.

First Department, December 14, 2006

### APPEARANCES OF COUNSEL

*McLaughlin & Stern, LLP*, New York City (*Alan E. Sash* and *Steven J. Hyman* of counsel), and *Law Offices of Robert I. Kalina*, New York City (*Robert I. Kalina* of counsel), for appellant.

*Raoul Lionel Felder, P.C.*, New York City (*Joshua R. Katz, Raoul Lionel Felder, Bettina D. Hindin* and *Robert C. Hiltzik* of counsel), for respondent.

### OPINION OF THE COURT

SAXE, J.P.

In this action plaintiff, alleging that defendant raped her while she was unconscious, seeks money damages based upon claims of intentional assault and infliction of emotional distress. The unique conflict of law issue at the heart of the underlying dismissal motion arises from the fact that the incident occurred in Brazil.

On December 31, 2002, the 31-year-old plaintiff, a New York resident, attended a New Year's Eve party on the small island of Angra, off the coast of Brazil. During the party, plaintiff alleges, she met 35-year-old defendant Damon Dash, a hip hop record producer and businessman, who is also a New York resident. Plaintiff alleges that Mr. Dash propositioned her repeatedly during the party that night, but she rejected his advances. Plaintiff left the party with three others at about 4:30 A.M. and returned to the guest house where she was staying, and, quite intoxicated, fell asleep. She asserts that at approximately 8:00 A.M., defen-

dant also returned to the guest house, and that shortly thereafter, she awoke to find defendant on top of her, raping her. She states that she screamed out to a woman passing by, who simply continued on her way; however, another woman, Deborah Brinkley, came downstairs in time to observe defendant putting on his pants. Plaintiff says that she then passed out again.

Plaintiff awakened at about 1:00 A.M. to find Miriam Soto sleeping beside her. Soto confirmed that defendant had engaged in sexual intercourse with plaintiff while asleep. At 1:30 A.M., plaintiff, accompanied by Soto and Brinkley, went to the Angra police station and filed a complaint against defendant. She thereafter underwent a physical examination at a nearby hospital.

Plaintiff returned to her home in New York on January 5, 2003, and subsequently commenced this action. Defendant moved to dismiss the complaint on the ground of forum non conveniens, or, in the alternative, for a ruling that Brazilian substantive law applies to this action. The motion court denied dismissal, concluding that the doctrine of forum non conveniens did not warrant dismissal in these circumstances; the court declined to rule on the choice of law question, finding it to be academic at that point.

■ At the outset, we affirm that portion of the order which denied dismissal on forum non conveniens grounds. Factors to be considered in determining a forum non conveniens motion include "the burden on the New York Courts, the potential hardship to defendant, the fact that the transaction giving rise to the action occurred in a foreign jurisdiction, as well as the residence of plaintiff" (*Herman v Spartinelli*, 176 AD2d 1238, 1239 [1991]). The burden rests on defendant here to show that the dispute would be better adjudicated in Brazil (*see Islamic Republic of Iran v Pahlavi*, 62 NY2d 474, 479 [1984], *cert denied* 469 US 1108 [1985]).

Both parties live and work in New York, as do many proposed nonparty witnesses, most particularly nonparty eyewitnesses. We perceive no real burden on the New York courts in hearing this claim as between two New Yorkers. We reject defendant's argument that Brazil is the proper forum because the incident occurred there and because of the hardship caused by the necessity of producing as witnesses in New York the local officials who responded to plaintiff's complaint.

Defendant cites *Banco do Estado de Sao Paulo v Mendes Jr. Intl. Co.* (249 AD2d 137, 138 [1998]), in which this Court af-

firmed a dismissal of counterclaims on grounds of forum non conveniens, explaining that "the underlying events and circumstances implicated by the counterclaims occurred in Brazil and that resolution of the issues posed by those events and circumstances mandates resort to Brazilian law and witnesses." However, in that case, the claimed events included business relationships between the Brazilian government and a Cayman Islands corporation with a principal place of business in Brazil.

In contrast, the present case involves a personal interaction between two New York residents who were briefly situated in a foreign locale. While plaintiff made statements to Brazilian law enforcement and hospital personnel, most of those individuals have no independent firsthand knowledge of the incident beyond the hearsay reported to them. Their importance as witnesses necessary to prove or disprove the claimed assault is far from established, especially since copies of police and medical reports concerning the incident have been obtained, translated and made part of the record (*cf.* CPLR 4518, 4542). Indeed, there is little basis to conclude that these individuals have material evidence to offer beyond that contained in their written reports (*see Grizzle v Hertz Corp.*, 305 AD2d 311, 312 [2003]).

The expense of litigating the claim in Brazil would be substantial, and plaintiff reasonably asserts that it would be financially prohibitive to her to pay travel and lodging expenses for counsel and witnesses. In contrast, press coverage regarding defendant, who is often called a "hip hop mogul," portrays him as an entrepreneur in control of multiple multi-million-dollar businesses. Although Brazil is not a signatory to the Hague Convention, and its citizens are therefore not subject to various formal international discovery devices, if a real need to obtain testimony from a Brazilian national arises in the course of this tort action, it appears likely that defendant has the financial resources necessary to locate any voluntary witnesses and arrange to transport them to New York from Brazil.

Thus, the heavy burden on a movant seeking dismissal on forum non conveniens grounds has not been carried here. Turning to the choice of law issue, we conclude that it should have been addressed on its merits, so the parties would know, for purposes of discovery, what issues would need to be addressed with evidentiary materials.

■ Prior to 1963, the choice of law issue would have been simple: the rule invariably followed by New York's Court of Appeals at that time was that of lex loci delicti, that is, that "the

substantive rights and liabilities arising out of a tortious occurrence are determinable by the law of the place of the tort" (*Babcock v Jackson*, 12 NY2d 473, 477 [1963]). Then, in *Babcock*, the Court of Appeals adopted a more flexible approach, to give "controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation" (12 NY2d at 481). A more nuanced approach is therefore now required.

The first step in choice of law analysis is determining whether an actual conflict exists between the jurisdictions involved (*see Matter of Allstate Ins. Co. [Stolarz—New Jersey Mfrs. Ins. Co.]*, 81 NY2d 219, 223 [1993]). Once an actual conflict is established, the court must turn to consideration of which jurisdiction, "because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation" (*Babcock v Jackson, supra* at 481), an analysis often called "interest analysis" (*see Cooney v Osgood Mach.*, 81 NY2d 66, 72 [1993]). The framework of this analysis raises two inquiries: "(1) what are the significant contacts and in which jurisdiction are they located; and (2) whether the purpose of the law is to regulate conduct or allocate loss" (*see Padula v Lilarn Props. Corp.*, 84 NY2d 519, 521 [1994]; *Schultz v Boy Scouts of Am.*, 65 NY2d 189, 197 [1985]). If the purpose of the competing laws is to allocate loss and the parties are both New Yorkers, "there is often little reason to apply another jurisdiction's loss allocation rules" (*see Cooney v Osgood Mach.*, 81 NY2d at 73); if their purpose is to regulate conduct, "the law of the jurisdiction where the tort occurred will *generally* apply because that jurisdiction has the greatest interest in regulating behavior within its borders" (*see id.* at 72 [emphasis added]).

In order to establish the initial requirement that an actual conflict exists between the controlling law of Brazil and that of New York, defendant relies upon an affidavit from Jose Pires Oliveira Dias, an attorney admitted to practice in Brazil. Mr. Dias asserts that "Brazilian law recognizes a cause of action based upon the allegations in plaintiff's complaint. It is basic Brazilian civil and criminal jurisprudence that one person may not sexually assault another." He goes on to state that "[t]he Constitution and Civil Code of Brazil afford plaintiff causes of action for the allegations in her complaint." Specifically, he says, the Brazilian Constitution guarantees inviolable rights to "freedom, equality, safety, intimacy, privacy, honor and image,"

and that if any of these rights are violated, a person has a right to money damages from the offender. Similarly, he says, Brazil's Civil Code proscribes any act which violates any right and causes harm to another person, and permits a person whose rights were violated to recover money damages. He asserts that if plaintiff can prove that she sustained damages from a violation of her rights to freedom, safety, intimacy, honor and image, she may be awarded money damages.

However, this Brazilian attorney's affidavit does not specify exactly what elements must be proved, and the standard of proof required to hold an individual civilly liable under Brazilian law for sexual assault. Instead, counsel simply asserts that since Brazilian law requires that plaintiff prove that her honor or image was damaged by the assault, Brazil's law requires much more than New York law, which would permit a finding of tort liability against defendant simply upon a showing that he made bodily contact with plaintiff and that the contact was either offensive or made without plaintiff's consent (citing *Messina v Alan Matarasso, M.D., F.A.C.S., P. C.*, 284 AD2d 32 [2001]).

The submitted material falls short of establishing that the difference between the law of New York and Brazil can be termed a "conflict." But, even assuming for purposes of discussion that defendant's evidence satisfies his burden of proving a conflict between the applicable law of Brazil and that of New York, we in any event would conclude that in the present circumstances, it is the law of New York that must be applied.

As regards the first inquiry of the "interest analysis" framework, New York is the only jurisdiction that has significant contacts with both parties since both of them live and work here (*see Babcock v Jackson*, 12 NY2d at 482; *see also Schultz*, 65 NY2d at 200-201). Indeed, aside from the fact that they were there for a few days while vacationing, the parties essentially have no contacts with Brazil.

Greater uncertainty arises in the second area of inquiry, that of characterizing as either loss-allocating or conduct-regulating the jurisdictions' competing rules of law, regarding holding an alleged attacker civilly liable for a claimed sexual assault.

The Court of Appeals has differentiated loss-allocating from conduct-regulating rules with the explanation that loss-allocating rules are applicable once there is admittedly tortious conduct, while conduct-regulating rules are those people use as a guide to governing their primary conduct (*see Schultz, supra*

at 198). However, the distinction between the two categories of rules has generated substantial discussion among scholars, and it has been recognized that "relatively few rules are purely conduct regulating or loss allocating" (*see* Borchers, Legal Development, *The Return of Territorialism to New York's Conflicts Law: Padula v. Lilarn Properties Corp.*, 58 Alb L Rev 775, 786 [1995]).

Most of the Court of Appeals' choice of law analyses in the tort arena have been in cases involving laws amenable to clear characterization as loss-allocating: *Babcock* and its progeny rejected application of other jurisdictions' so-called "guest statutes" when both parties to the lawsuit were New York residents. The Court ruled the same way regarding other jurisdictions' statutes placing ceilings on amounts recoverable for wrongful death (*see Miller v Miller*, 22 NY2d 12 [1968]), and other jurisdictions' charitable immunity statutes (*see Schultz, supra*). In these circumstances, where the parties were both New Yorkers, the Court has clearly concluded that there is no compelling reason to apply the foreign jurisdiction's law.

Few cases have analyzed other jurisdiction's rules of tort law and, upon determining that they fall into the conduct-regulating category, applied that other jurisdiction's rule. In one of the few, *Padula v Lilarn Props. (supra)*, the Court considered a Labor Law claim brought by a New York resident against a New York corporation, arising out of an accident that occurred while plaintiff was performing work at a construction project in Massachusetts. After observing that Labor Law §§ 240 and 241 *"embody both conduct-regulating and loss-allocating functions* requiring worksites to be made safe," the Court held that those sections "are primarily conduct-regulating rules," and as a result, it held that Massachusetts law ought to be applied (*id.* at 522, 523 [emphasis added]).

The law of intentional assault applicable here, like the law regarding liability for workers' injuries, includes components of loss allocation as well as of conduct regulation. However, it is not useful in this instance to embark upon what must necessarily be an arbitrary weighing process to decide whether such a rule should be deemed "primarily" conduct-regulating or loss-allocating, as the Court did in *Padula*. Even where a law is conduct-regulating, we do not blindly follow the lex loci rule. Rather, we must still decide whether the foreign jurisdiction has the greater interest in addressing the alleged conduct.

In the prototypical "rules of the road" conflict of laws example, the foreign jurisdiction's concern with ensuring that

such rules are followed by drivers within its borders is indisputably paramount; any jurisdiction must be entitled to ensure that drivers within its borders are held to its rules (*see Babcock, supra* at 483; *Schultz, supra*). Indeed, no other standard of conduct for drivers would make sense.

However, in other types of situations the analysis is less one-sided, and the competing concerns of the two jurisdictions must be considered. When we consider the question of whether the alleged facts establish a tortious and compensable assault by one individual against another, it is apparent that there are other interests at stake besides Brazil's interest in enforcing its standards for the conduct of citizens and noncitizens within its border. New York has a strong interest in seeing that its aggrieved citizens obtain redress for wrongs committed upon them by other citizens of New York, regardless of where the act took place.

The discussion in *Schultz v Boy Scouts* (*supra*) is helpful for framing our analysis here, although the case is not directly analogous to this one and the ruling is not controlling. The Court there considered a fact pattern involving New Jersey plaintiffs, one New Jersey defendant and another from Ohio, and tortious conduct—sexual abuse of two boys by a man who was their teacher and the leader of their Boy Scout troop—that occurred primarily in New York. The conflict of law presented, that is, the defense of charitable immunity which was available under New Jersey law but not under that of New York, fell within the category of loss-allocating. Yet, although plaintiffs and one of the defendants had a common domicile, the Court did not automatically apply the law of the parties' domicile, as the *Babcock* rule would seem to indicate. Because the Court viewed the circumstances as a " 'reverse' *Babcock* case," where New York was not the mutual domicile but was the "forum-locus," it conducted a full analysis of "the reasons most often advanced for applying the law of the forum-locus and those supporting application of the law of the common domicile" (65 NY2d at 199, 200). One of the important points it focused on was raised in its discussion of why *Babcock* had applied New York negligence law rather than Ontario's guest statute. The *Schultz* court explained:

> "[k]ey, however, was New York's interest in requiring a tort-feasor to compensate his guest for injuries caused by his negligence. That concern would have been completely thwarted if Ontario's laws were ap-

plied to the action, *whereas the application of New York's law would not threaten the policy underlying Ontario's statute,* its interest in preventing fraudulent claims against its defendants and their insurer." (65 NY2d at 196 [emphasis added], citing *Babcock, supra* at 482-483.)

That analytical framework, comparing whether or not the policy underlying each jurisdiction's rule would be thwarted by application of the other's rule, was employed by the *Schultz* court in deciding to apply the New Jersey charitable immunity statute, with the observation that

"application of the law of New Jersey . . . would further that State's interest in enforcing the decision of its domiciliaries to accept the burdens as well as the benefits of that State's loss-distribution tort rules and its interest in promoting the continuation and expansion of defendant's charitable activities in that State. Conversely, although application of New Jersey's law may not affirmatively advance the substantive law purposes of New York, it will not frustrate those interests because New York has no significant interest in applying its own law to this dispute" (65 NY2d at 201).

Accordingly, it is useful in our analysis to consider whether the application of the law of Brazil would thwart or threaten an important policy underlying New York's law, or, on the other hand, whether the application of New York law would frustrate any policies underlying Brazil's applicable rule of law.

Defendant emphasizes that Brazil has a sovereign interest in regulating conduct within its borders, citing *Hill v Citicorp* (215 AD2d 117 [1995], *lv denied* 87 NY2d 802 [1995]). However, in *Hill v Citicorp*, England was said to have "an interest in protecting *subjects*, such as the individual plaintiff, from foreign businesses that commit tortious acts while seeking customers there" (215 AD2d at 117 [emphasis added]). In contrast, the present litigation provides no proposed protection of anyone in Brazil, and, indeed, the outcome of the litigation will have no impact at all on Brazil or any of its citizens or residents. Brazil's interest in ensuring that citizens and noncitizens damaged by tortious conduct within its borders have the right to seek compensation from the tortfeasor, is in no way damaged by application of New York law in the present case. In addition, while enforcement of its rules regarding misconduct within its borders could gener-

ally be said to serve as a deterrent against future tortious conduct, the possibility of such a deterrent effect being felt in Brazil is minimal where the interaction was entirely between New Yorkers, and the matter is being addressed in a New York court.

In contrast, assuming that defendant correctly portrays Brazil's policy as intended to compensate only those victims of sexual assault whose "honor" or "image" was damaged by the assault, application of Brazil's rule could thwart New York's strong interest in providing recompense for its residents who have been injured by a sexual assault, especially if it was perpetrated by another New Yorker.

So, even if the purpose of the Brazilian rule of law were said to be primarily conduct-regulating, in this context the general rule that "the law of the jurisdiction where the tort occurred will *generally* apply" (*see Cooney*, 81 NY2d at 72 [emphasis added]) should not be applied. New York's interest in addressing the alleged misconduct is stronger than Brazil's, particularly since application of New York's tort law *"would not threaten the policy underlying [Brazil's rule of law]"* (*Schultz*, 65 NY2d at 196 [emphasis added]). We therefore conclude that New York law must govern this action, notwithstanding the occurrence of the alleged tort in Brazil and the conduct-regulating aspects of the competing rules.

Accordingly, the order of the Supreme Court, New York County (Leland DeGrasse, J.), entered January 6, 2005, which, in an action for personal injuries, denied defendant's motion to dismiss the complaint on the ground of forum non conveniens, or, in the alternative, for a declaration that Brazilian law applies, should be modified, on the law, to declare that New York law applies, and otherwise affirmed, without costs.

MARLOW, NARDELLI, SWEENY and CATTERSON, JJ., concur.

Order, Supreme Court, New York County, entered January 6, 2005, modified, on the law, to declare that New York law applies, and otherwise affirmed, without costs.