CeltixConnect Equity Investors LLC, Plaintiff,

against
Sea Fibre Network Ltd T/A CELTIXCONNECT, DIANA HODNETT, REDWOOD CAPITAL GROUP, LLC, and RCG, LLC, Defendants.


653340/2014

Kutak Rock LLP, for plaintiff.
Murray & DiBella, LLP, for the SFN Parties. 
Kaye Scholer LLP, for Redwood. 


Shirley Werner Kornreich, J.

Motion sequence numbers 008 and 009 are consolidated for disposition.
Defendants Redwood Capital Group, LLC and RCG, LLC (collectively, Redwood) move, pursuant to CPLR 3211(a)(1) and (7) and 3016(b), to dismiss the claims asserted against them in the Amended Complaint (the AC). Seq. 008. Defendants Sea Fibre Networks Ltd (SFN) and Diane Hodnett (collectively, the SFN Defendants) separately move (1) pursuant to CPLR 327, to dismiss the action on the ground of forum non conveniens; and (2) pursuant to CPLR 3211(a)(1) and (7) and 3016(b), to dismiss the claims asserted against them in AC. Seq. 009. Plaintiff CeltixConnect Equity Investors, LLC (Celtix) originally opposed both motions but, during oral argument, requested, over defendants' objections, to withdraw the AC in light of the SFN Defendants' forum non conveniens arguments (and their accurate inclination that the court agrees with such arguments). See Dkt. 160 (5/5/16 Tr. at 28).[FN1]
Since the complaint has already been amended in response to a prior motion to dismiss, defendants ask this court to reach the merits of whether the AC fails to state a claim against Redwood. Redwood, however, consents to a forum non conveniens dismissal in the event its motion to dismiss is denied. For the reasons that follow, the court dismisses the AC against Redwood for failure to state a claim and dismisses the action against the SFN Defendants on the ground of forum non conveniens.
[*2]I. Factual Background & Procedural History
As this is a motion to dismiss, the facts recited are taken from the AC (see Dkt. 86) and the documentary evidence submitted by the parties. 
Celtix is a Delaware LLC that invested in SFN, a company incorporated in Ireland. SFN planned on constructing, owning, and operating a "sub-sea telecommunications cable that traverses the ocean between Ireland and Wales." See AC ¶ 2. Celtix claims SFN stole that plan, along with the attendant intellectual property, from a competitor, and that the discovery of such theft, along with myriad other alleged false promises, resulted in the failure of SFN's business. In this action, Celtix claims that SFN and its CEO, Hodnett, fraudulently induced its investment in SFN. Celtix also claims that Redwood, an international investment bank hired by SFN to solicit investors, also fraudulently induced Celtix's investment.
Specifically, Celtix alleges that in 2009, Hodnet met with Robert Doherty, a partner at Redwood, to discuss soliciting investors in SFN. SFN formally engaged Redwood in January 2010. In February 2010, Doherty and two other Redwood employees spent three days in Dublin, Ireland meeting with SFN and conducting due diligence on the company, which was used to draft an offering memorandum to prospective investors. Later that month, Doherty contacted Stephen Martin, a member of Celtix, to solicit his investment in SFN. At the time, Martin lived in Colorado, but allegedly agreed to meet with Doherty in New York. They allegedly met in a Manhattan restaurant on February 22, 2010. The parties dispute what was discussed at that meeting. Doherty is claimed to have stated that the investment in SFN was the "best telecom transaction" Doherty had ever seen.
Months later, at the end of 2010, Redwood sent Celtix an investment memorandum, titled "Confidential Executive Summary", and another document, titled "Celtix Connect — Customer Pipeline", which lists potential telecommunications clients that SFN hoped [FN2]
would pay for the right to use its telecommunications cable. See Dkt. 87 (the Memorandum) & Dkt. 88 (the Pipeline Chart) (collectively, the Investment Materials).
The Memorandum is prefaced with the following disclaimers:
The information presented in this Confidential Executive Summary (the "Memorandum") was prepared by [SFN]. The sole purpose of this Memorandum is to provide the recipient with information about [SFN] and its industry.

Recipients of the Memorandum are presumed to be familiar with the communications and fiber industries and accordingly, this Memorandum contains only selected operating, financial and other information about [SFN]. While [SFN] believes that the information contained herein is accurate, it expressly disclaims any and all liability for representations or warranties, expressed or implied, contained in, or for omissions from, thisMemorandum or any other written or oral communication transmitted or made available.
This Memorandum does not constitute an offer to sell, or a solicitation of an offer to purchase, any securities of the Company.
See Dkt. 87 at 3 (emphasis added).
The substance of the Memorandum presents an overview of SFN's business plan:

 [SFN] is building an undersea telecommunications cable consisting of 72 fiber pairs (144 fiber strands) between Dublin, Ireland and the United Kingdom. Originating from Ireland, [SFN] will open a high capacity gateway which will provide unrivalled capacity and connectivity to enterprises, carriers and mobile operators. [SFN's] cable infrastructure will use the latest technology and will be shorter, more diverse and scalable than any of the existing cables. The [SFN] cable will provide a portfolio of high capacity communications products including a unique "wet route" offering of dark or managed fiber.

The cable will offer the ability to connect to numerous third party long-haul and metro fiber networks in both Ireland and the U.K. and in doing so offer end users full connectivity from Dublin to anywhere in Europe and the U.S. Unlike other cables installed by carriers for their own purposes, the Company's cable will be carrier neutral and will be available to all carriers, mobile operators, ISPs as well as enterprise customers. The Company will market its high capacity services to technology companies e.g. cloud computing providers, Internet-based organizations such as media/content providers, telecommunications companies, financial service firms and other large enterprises. The Company is privately held and based in Dublin, Ireland.
See Dkt. 87 at 4.
The Memorandum then provides "Key Considerations" regarding the business, such as increased demand for the type of cable being built, the technological superiority of its cable, and the high barriers to entry in the industry. See id. at 4-5. With respect to the latter issue, the Memorandum states:
[SFN] has completed all of its required applications for the cable lay, a process that began in 2007 and which has only recently been completed following a comprehensive and time consuming process of consultation and applications with both the Irish and U.K. vested parties. The Company believes that receipt of its final approval for the main cable lay is imminent and accordingly the Company is of the view that it has at least an 18 month head start on any competitor wishing to build a competitive cable. Furthermore as authorities seek to enforce route diversity of cables on the seabed, no new competitor will have the ability to utilize the same route as [SFN]. The exhibit below clearly outlines the detailed regulatory process that [SFN] has gone through over the past 18 months to achieve the necessary Irish and U.K. regulatory approvals. To date, no other company has applied for cable laying permits in Ireland.
See id. at 5 (emphasis added).
Section V of the Memorandum, titled "Sales Strategy & Products", begins by stating:

 [SFN] is currently in active discussions with a number of international carriers and large enterprise organizations with regard to their potential use of the [SFN] subsea product set. The Company's initial go-to-market strategy will see it secure a small number of "anchor tenants" on preferential terms before then marketing its products on general price book terms to all [*3]organizations that require to efficiently transport larger amounts of data and content.

See id. at 9. A chart is then provided with potential customers in various industries, such as telecommunications (e.g., Verizon), technology, (e.g., Google), banking (e.g., JPMorgan), and media (e.g., Disney). See id. at 10. The Memorandum also discusses competition:
While there are other subsea cables connecting Ireland and the U.K., many of these cable systems are fast approaching their end of life. With 72 fiber pairs, [SFN's] cable will have more fiber capacity than all of the existing cables systems combined. In addition[,] as the Company's cable route is significantly shorter than all other existing Ireland-U.K. subsea routes, it will be unrepeated. This ensures very low latency transmissions and greatly increased resilience and robustness. Further[, SFN's] unique landing points will in addition to being the primary route for some customers also provide diversity options to those customers already on legacy cable systems.
[chart concerning existing cables omitted]
Management has extensive experience gained over many years in designing and building other subsea cables systems. Such experience has seen management develop strong working relationships with all of the key government agencies involved in the regulatory and permitting process. Consequently, [SFN] has to date received all but one of the necessary permits and applications that it requires to commence cable laying. Due to the complexity of the regulatory and application process, the Company believes it has an 18+ month head start on any potential competitor who may wish to build an undersea cable. [SFN] believes accordingly that it has more than sufficient time to build critical customer mass and in doing so negate the commercial attractiveness of any potential competitive cable build.
See id. at 9-10 (emphasis added).
The Pipeline Chart provides further information about SFN's prospective customers. For instance, it notes that SFN submitted a proposal to AT & T and was meeting with Verizon. See Dkt. 88 at 2. It contains information about such customers' needs, for example, by noting that Google has "substantial operations" and is "looking for fiber connectivity to U.K. and beyond." See id.
Shortly after Celtix was provided with the Investment Materials, on December 11, 2010, Doherty had another meeting with Martin, during which Doherty allegedly made the following oral representations:
(a) that Doherty was an expert on telecommunications, and that the investment was "the best deal [he] had ever seen in [his] banking career;"
(b) that investment in [SFN] was a real opportunity for a non-[private equity] group of investors to get in for low equity given the decline in the Irish market, that the debt portion of financing was already set, and that the potential return was amazing;
(c) that [SFN] would have a "monopoly" position (he repeated this claim of a "monopoly" position often in the coming weeks) and that no one else would enter the water;
(d) that client demand for [SFN] was huge and that [SFN] had customers prepared to purchase fibre directly upon lighting the fibre; and
(e) that [Hodnett] and another principal of [SFN], Noel Meaney, were experts in telecom, were fully familiar with the unique nature of the Irish telecom market and were very well-connected, and that they had excellent backgrounds with a range of companies in the industry.
See AC ¶ 26. Celtix claims that these representations and many of the representations in the Investment Materials were false. 


After reviewing the Investment Materials, members of Celtix traveled to Ireland and spent three days, December 15-17, 2010, meeting with defendants to discuss their proposed investment in SFN. During that visit, Doherty and Hodnett allegedly made further representations regarding the business, such as customer demand being "huge" and that SFN was "locking up an assured monopoly.'" See AC ¶ 34. Defendants continued to solicit Celtix after the Ireland trip and, in August 2011, Celtix decided to invest 𔚼 million (which the AC claims was then worth $5.64 million) in SFN. 


On August 22, 2011, Celtix executed a Shareholders Agreement, which governs its investment in SFN. See Dkt. 95. The Shareholders Agreement is governed by Irish law and contains a non-exclusive Irish forum selection clause. See id. at 30. Section 6 of the Shareholders Agreement addresses warranties to SFN's investors. See id. at 15. The warranties are set forth in Schedule 3 to the Shareholders Agreement. See id. at 39. They include a warranty that SFN had disclosed all threatened litigation. See id. at 43-44. 
On November 2, 2011, Celtix transmitted its 𔚼 million investment to SFN. Redwood was paid $700,000 by SFN for its inducement of Celtix's investment.
Less than two months later, by letter to SFN dated December 30, 2011, the law firm of DLA Piper, writing as counsel for non-party Geo Networks Limited (Geo), claimed, inter alia, that the chairman of SFN, Noel Meaney, the former chairman of a company called EuNetworks, breached a March 2007 nondisclosure agreement (NDA) between Geo and EuNetworks. See Dkt. 93 (the DLA Piper Letter). Hodnett, a former employee of a company called McMahon Design and Management Limited, also allegedly beached a May 2009 NDA. Geo claimed that the confidential information that supposedly was subject to these NDAs was wrongfully being used by SFN to develop its telecommunications cable. Geo threatened litigation. Nothing in the record indicates that a lawsuit was ever filed or if the claims in the DLA Piper Letter have merit. The DLA Piper Letter indicates that Geo and SFN were in conflict over these issues in December 2009, but that Geo chose not to "exercise its rights over the confidential information and intellectual property" at that time but "fully reserved its right to do so." See id. at 4. Celtix alleges that SFN never disclosed its dispute with Geo prior to Celtix investing, and that its decision to invest would have been impacted by allegations that Celtix misappropriated Geo's intellectual property and Geo's status as a competitor pursing the exact same undersea cable project.
On January 5, 2012, Hodnett sent a copy of the DLA Piper Letter to Celtix. In June 2012, Martin met with Geo's CEO, Chris Smedley. Celtix claims that, at the meeting:
Smedley restated the substance and allegations of the DLA [Piper] Letter. He confirmed that [SFN and Hodnett] had stolen its Business IPR from Geo in violation of confidentiality agreements, including Geo's project plans, its business plan, its marketing plan, its landing site, [*4]and its conceptual route for [SFN's] sub-sea telecommunications cable. He confirmed that [Geo] had threatened litigation against [SFN and Hodnett]. He confirmed that Geo retained meritorious claims against [SFN and Hodnett].
See AC ¶ 62. Geo, it appears, was indeed in direct competition with SFN to lay the same undersea cable. In the end, Geo laid its own cable and competed for the same business as SFN. As of the end of 2013, SFN only had two customers, SFN's business failed, and Celtix lost its investment.
On October 31, 2014, Celtix commenced this action by filing a summons and its original complaint, which, in addition to SFN, Hodnett, and Redwood, also named Glenfarne I.T. & Consultancy Limited (Glenfarne), an Irish company, as a defendant. See Dkt. 2. Multiple extensions of time to serve the Irish defendants were granted. On September 2, 2015, defendants moved to dismiss the original complaint. Defendants withdrew their motions once Celtix elected to amend its complaint. See Dkt. 80 & 106. 
Celtix filed the AC on November 2, 2015. See Dkt. 86. The AC is essentially the same as the original complaint, except it no longer asserts claims against Glenfarne and contains a few new allegations supposedly justifying New York venue. The AC asserts nine causes of action: (1) fraudulent inducement, asserted against Redwood; (2) negligent misrepresentation, asserted against Redwood; (3) negligence, asserted against Redwood; (4) fraudulent inducement, asserted against the SFN Defendants; (5) negligent misrepresentation, asserted against the SFN Defendants; (6) negligence, asserted against the SFN Defendants; (7) breach of fiduciary duty, asserted against Hodnett; (8) breach of warranty, asserted against SFN; and (9) breach of warranty, asserted against Hodnett. 
On December 6, 2015, defendants filed the instant motions to dismiss on the grounds of failure to state a claim and forum non conveniens. With respect to the latter issue, SFN contends that the dispute underlying the AC has nothing to do with New York. Celtix, a Delaware LLC that did not conduct any business in New York, invested in SFN, an Irish company, which also did not conduct any business in New York. The contract governing the investment, the Shareholders Agreement, is governed by Irish law, and the due diligence was conducted in Ireland. Indeed, the AC's only attempt to connect the lawsuit to New York is the alleged February 2010 restaurant meeting and the Manhattan residence of one of Celtix's members, John Lazerow. Lazerow, however, is not a party and, unlike another of Celtix's members, Martin, is not alleged in the AC to have substantively interacted with defendants. Martin was a Colorado resident, and his only relevant connection to New York was his alleged single meeting with Redwood.[FN3]

Most importantly, there are essential non-party witnesses located beyond this court's jurisdiction in Ireland. Leaving aside the burden of defendants SFN and Hodnett having to come [*5]to New York to litigate an Irish transaction governed by Irish law, the non-party Geo witnesses, who also are located in Ireland, are beyond this court's jurisdiction. Moreover, SFN submitted an expert affidavit from Cian Ferriter, an Irish Barrister, explaining that Celtix has the ability to maintain this action in the Irish court system and that Ireland recognizes the causes of action asserted. See Dkt. 123. Clearly, Ireland is an adequate alternative forum. Celtix does not dispute this. Nonetheless, it asks the court to permit it to litigate in its preferred forum, New York. 
For the reasons set forth below, the court finds New York to be a highly inappropriate forum for Celtix's claims against the SFN Defendants and dismisses the action against the SFN Defendants on the ground of forum non conveniens. While Ireland is, as Redwood concedes, also an adequate forum for the claims against Redwood, the court dismisses the claims against Redwood for failure to state a claim. 
II. The SFN Defendants' Motion to Dismiss
A. Forum Non Conveniens

CPLR 327(a) provides that "[w]hen the court finds that in the interest of substantial justice the action should be heard in another forum, the court ... may stay or dismiss the action in whole or in part on any conditions that may be just." See Mashreqbank PSC v Ahmed Hamad Al Gosaibi & Bros. Co., 23 NY3d 129, 135 (2014). "In general, a decision to grant or deny a motion to dismiss on forum non conveniens grounds is addressed to a court's discretion." Id. at 137. Such discretion permits this court to dismiss "an action where it is determined that the action, although jurisdictionally sound, would be better adjudicated elsewhere.'" Century Indem. Co. v Liberty Mut. Ins. Co., 107 AD3d 421, 423 (1st Dept 2013) (emphasis added), quoting Islamic Republic of Iran v Pahlavi, 62 NY2d 474, 478-79 (1984). "Among the factors to be considered are the burden on the New York courts, the potential hardship to the defendant, and the unavailability of an alternative forum in which the plaintiff may bring suit. The court may also' consider that both parties to the action are nonresidents and that the transaction out of which the cause of action arose occurred primarily in a foreign jurisdiction." Bank Hapoalim (Switzerland) Ltd. v Banca Intesa S.p.A., 26 AD3d 286, 287 (1st Dept 2006), accord Pahlavi, 62 NY2d at 479. "No one factor is controlling. The great advantage of the rule of forum non conveniens is its flexibility based upon the facts and circumstances of each case. The rule rests upon justice, fairness and convenience and we have held that when the court takes these various factors into account in making its decision, there has been no abuse of discretion reviewable by this court." Pahlavi, 62 NY2d at 479 (citations omitted). 
While certainly not dispositive [see Hanwha Life Ins. v UBS AG, 127 AD3d 618, 619 (1st Dept 2015)], "the fact that foreign law is at issue weighs in favor of dismissal." Norex Petroleum Ltd. v Blavatnik, 48 Misc 3d 1226(A), at *23 (Sup Ct, NY County 2015) (Bransten, J.), citing Shin-Etsu Chem. Co. v 3033 ICICI Bank Ltd., 9 AD3d 171, 178 (1st Dept 2004) ("applicability of foreign law is an important consideration in determining a forum non conveniens motion"). Cases where, as here, the plaintiff is incorporated outside of New York and where, as here, plaintiff's claims concern its investment in another non-New York company, are routinely dismissed on forum non conveniens grounds. See, e.g., Bluewaters Commc'ns Holdings, LLC v Ecclestone, 122 AD3d 426, 428 (1st Dept 2014) ("this case stems from the failure of a Jersey company (with offices in Jersey and London) to acquire the shares of another [*6]Jersey company from a German bank [and thus the case] lack[s] a substantial nexus with New York'"), quoting Martin v Mieth, 35 NY2d 414, 418 (1974) ("Since the touchstone of forum non conveniens is flexibility, our courts need not entertain causes of action lacking a substantial nexus with New York"); see also FIMBank P.L.C. v Woori Fin. Holdings Co., 104 AD3d 602, 603 (1st Dept 2013) ("This dispute has no substantial nexus with New York and the resolution of this case may require consideration of Korean law."); Farahmand v Dalhousie Univ., 96 AD3d 618, 619 (1st Dept 2012) ("the incidents giving rise to the claims occurred in Nova Scotia, Nova Scotia law governs the claims, and the documentary evidence and witnesses are located in Nova Scotia").
B. Discussion
Celtix's claims against the SFN Defendants have no meaningful connection to New York. They should not be litigated in this court. Celtix is a foreign LLC. Aside from a single, alleged preliminary meeting with a Redwood employee, none of the events giving rise to Celtix's investment in SFN occurred in New York. Ireland, in contrast, is a far more appropriate forum. Celtix conduced due diligence in Ireland, the company it invested in (SFN) is an Irish company, and the governing contract (the Shareholders Agreement) is governed by Irish law and provides for non-exclusive venue in Ireland. The parties, thus, foresaw litigation in Ireland and intended their contractual disputes to be governed by Irish law. Irish law may indeed apply to all of the claims against the SFN Defendants, such as fraud. It is hard to see how New York's choice of law rules would call for the application of New York law. See Cooney v Osgood Mach., Inc., 81 NY2d 66, 72 (1993) (New York seeks to give effect to the "law of the jurisdiction having the greatest interest in resolving the particular issue"); K.T. v Dash, 37 AD3d 107, 111 (1st Dept 2006) ("the Court of Appeals give[s] controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation'"), quoting Babcock v Jackson, 12 NY2d 473, 477 (1963). Ireland, by far, has the greatest interest in this case. And while this court is often called upon to apply foreign law, one of the issues that surely will arise — the coexisting of possibly duplicative contractual breach of warranty and fraudulent inducement claims — is difficult enough to address under New York law [see, e.g., Wyle Inc. v ITT Corp., 130 AD3d 438 (1st Dept 2015)], let alone Irish law, with which this court is unfamiliar. None of the parties meaningfully briefed whether the claims against the SFN Defendants are valid under Irish law and, therefore, the court will not opine on this issue.
Most importantly, obtaining document discovery and depositions from Geo will be far more difficult in New York than in Ireland. The expensive, time consuming process of seeking discovery under the Hague Convention can be entirely avoided by litigating in Ireland. The SFN Defendants cannot mount an adequate defense without this discovery. To compel them to litigate in a court without jurisdiction over Geo when another, far more appropriate venue has jurisdiction, is the very sort of factor that demonstrably weighs in favor of forum non conveniens dismissal. While a United States based plaintiff would surely prefer to litigate in this court, the prejudice to the SFN Defendants is too great to overlook, particularly when neither Celtix nor the subject investment have any connection to New York and much of the evidence and witnesses are located in Ireland. Justice, fairness and convenience militate in favor of dismissal.
The action against the SFN Defendants, therefore, is dismissed on forum non conveniens grounds upon condition that the SFN Defendants stipulate to submit to Irish jurisdiction and [*7]agree waive any statute of limitations defense. That said, as discussed below, while viable claims against Redwood also are better litigated in Ireland instead of this court, the claims against Redwood pleaded in the AC are dismissed for failure to state a claim.

III. Redwood's Motion to Dismiss
A. Legal Standard
On a motion to dismiss for failure to state a claim, the court must accept as true the facts alleged in the complaint as well as all reasonable inferences that may be gleaned from those facts. Amaro v Gani Realty Corp., 60 AD3d 491 (1st Dept 2009); Skillgames, LLC v Brody, 1 AD3d 247, 250 (1st Dept 2003), citing McGill v Parker, 179 AD2d 98, 105 (1st Dept 1992); see also Cron v Harago Fabrics, 91 NY2d 362, 366 (1998). The court is not permitted to assess the merits of the complaint or any of its factual allegations, but may only determine if, assuming the truth of the facts alleged and the inferences that can be drawn from them, the complaint states the elements of a legally cognizable cause of action. Skillgames, id., citing Guggenheimer v Ginzburg, 43 NY2d 268, 275 (1977). Deficiencies in the complaint may be remedied by affidavits submitted by the plaintiff. Amaro, 60 NY3d at 491. "However, factual allegations that do not state a viable cause of action, that consist of bare legal conclusions, or that are inherently incredible or clearly contradicted by documentary evidence are not entitled to such consideration." Skillgames, 1 AD3d at 250, citing Caniglia v Chicago Tribune-New York News Syndicate, 204 AD2d 233 (1st Dept 1994). Further, where the defendant seeks to dismiss the complaint based upon documentary evidence, the motion will succeed if "the documentary evidence utterly refutes plaintiff's factual allegations, conclusively establishing a defense as a matter of law." Goshen v Mutual Life Ins. Co. of NY, 98 NY2d 314, 326 (2002) (citation omitted); Leon v Martinez, 84 NY2d 83, 88 (1994).
B. Discussion
Celtix asserts claims for fraud and negligent misrepresentation against Redwood.[FN4]
The parties dispute whether New York or Delaware law applies to these claims, but since they cite no meaningful difference between such laws, the court applies New York law.[FN5]
See TBA Global, [*8]LLC v Proscenium Events, LLC, 114 AD3d 571, 572 (1st Dept 2014). 
Under New York law, to state a claim for fraud, the plaintiff must plead "a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." Eurycleia Partners, LP v Seward & Kissel, LLP, 12 NY3d 553, 559 (2009); see Basis Yield Alpha Fund (Master) v Goldman Sachs Group, Inc., 115 AD3d 128, 135 (1st Dept 2014). "A claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." J.A.O. Acquisition Corp. v Stavitsky, 8 NY3d 144, 148 (2007). In other words, the difference between fraud and negligent misrepresentation is the requisite intent of the defendant — that is, fraud requires actual intent to defraud while negligent misrepresentation, as its name suggests, does not.

Celtix's negligent misrepresentation claim is not viable. Celtix and SFN were arms' length counterparties to the Shareholders Agreement. Redwood, the investment bank hired by SFN to solicit Celtix investment, was SFN's agent. Celtix's members knew Redwood was working for SFN, and, thus, that Redwood was not its fiduciary.[FN6]
While that does not absolve Redwood of the duty to speak truthfully, liability for any of Redwood's alleged misrepresentations may only exist if Redwood acted with the requisite intent to defraud. Celtix's negligent misrepresentation claim, therefore, is dismissed. 
Celtix's fraud claim is dismissed because it does not plead scienter in the AC with the particularity required by CPLR 3016(b). While facts regarding scienter are " most likely to be within the sole knowledge of the defendant and least amenable to direct proof,' plaintiff is still required to allege facts from which it is possible to infer defendant[s'] knowledge of the falsity of [their] statements' when they were made." MP Cool Invs. Ltd. v Forkosh, 33 NYS3d 194, 2016 NY Slip Op 04159, at *3 (1st Dept May 31, 2015), quoting Houbigant, Inc. v Deloitte & Touche, LLP, 303 AD2d 92, 98-99 (1st Dept 2003). The AC does not plead that Redwood intended to defraud Celtix or that it actually knew that the subject, alleged misrepresentations were false. Rather, in conclusory fashion, Celtix claims Redwood must have been aware of their falsity. This is insufficient. See Giant Group, Ltd. v Arthur Andersen, LLP, 2 AD3d 189, 190 (1st Dept 2003) (scienter may not be inferred where "[p]laintiff alleges only that defendants knew or recklessly failed to discover" the truth of the subject misrepresentations). "[N]egligence claims cannot be deemed fraud solely because of the nomenclature used and conclusory allegations of fraud." Id., quoting LaSalle Nat'l Bank v Ernst & Young LLP, 285 AD2d 101, 109 (1st Dept 2001). No other basis to infer scienter exists. The motive suggested by Celtix — the procurement of Redwood's $700,000 fee — cannot be used to infer scienter. The prevalent view in our state courts, and the well-settled rule in the federal courts, is that the motive to earn a fee, without more, cannot be used to infer scienter. See SSR II, LLC v John Hancock Life Ins. Co. (U.S.A.), 37 Misc 3d 1204(A) (Sup Ct, NY County 2012), citing Zutty v Rye Select Broad [*9]Market Prime Fund, L.P., 33 Misc 3d 1226(A), at *12 (Sup Ct, NY County 2011) (motive to earn fees "is found in virtually all commercial transactions, making it an ill-suited motive from which to draw an inference of intent to defraud"), quoting Tech. Support Servs., Inc. v Int'l Bus. Machs. Corp., 18 Misc 3d 1106(A), at *30 (Sup Ct, Westchester County 2007), citing In re Merrill Lynch Co. Research Reports Secs. Lit., 289 FSupp2d 416, 428 (SDNY 2003) ("If this Court were to accept the plaintiffs' allegations of scienter as adequate, it would essentially read the scienter element out of existence" because "all individuals are assumed to desire to increase their compensation").[FN7]

Additionally, even if scienter could be inferred based on the allegation that Redwood should have discovered the falsity of SFN's representations, Celtix cannot claim justifiable reliance. As the First Department recently explained:

 where the plaintiff is a sophisticated party, "if the facts represented are not matters peculiarly within the [defendant's] knowledge, and the [plaintiff] has the means available to [it] of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, [the plaintiff] must make use of those means, or [it] will not be heard to complain that [it] was induced to enter into the transaction by misrepresentations." 


MP Cool, 2016 NY Slip Op 04159, at *3, quoting ACA Fin. Guar. Corp. v Goldman, Sachs & Co., 25 NY3d 1043, 1044 (2015). The Memorandum confirms the undisputed fact that Celtix is a sophisticated investor with knowledge of the industry and that Celtix conducted extensive due diligence. Leaving aside the question of whether Celtix can plead reasonable reliance on its claims against SFN (an issue the court need not and does not reach and which is irrelevant to a claim for breach of warranty),[FN8]
it certainly cannot plead reasonable reliance with respect to Redwood. 
Celtix does not allege that it had less due diligence access than Redwood. Indeed, both Celtix and Redwood spent three days in Ireland conducting due diligence. Redwood is not alleged to have had access to information Celtix could not discover on its own. The only reasonable inference that can be drawn from the AC is that, to the extent there was information that would have revealed the falsity of SFN's representations, no one outside of SFN knew about [*10]it. If Redwood did not have the means to discover the fraud, it could not have acted with scienter. Conversely, if it did, then Celtix cannot claim reasonable reliance. See MP Cool, 2016 NY Slip Op 04159, at *3 (plaintiffs has access to company's information and "[t]here is no factual basis on which to conclude that the alleged fraud involved matters peculiarly within defendants' knowledge").
In light of Celtix's failure to plead scienter, the court will not extensively address which of the myriad alleged misrepresentations are or are not actionable.[FN9]
That said, it should be noted that Celtix is, at least in part, relying on classic puffery on the part of Redwood. See Northern Group Inc. v Merrill Lynch, Pierce, Fenner & Smith Inc., 135 AD3d 414, 422 (1st Dept 2016); Longo v Butler Equities II, L.P., 278 AD2d 97 (1st Dept 2000). When an investment banker pitches a sophisticated investor with lines such as a deal being the "best he's ever seen," that is understood to be puffery, not a material representation of fact that should inform an investment decision. See Koch v Greenberg, 14 FSupp3d 247, 256 (SDNY 2014), aff'd 626 FApp'x 335 (2d Cir 2015), citing Bareham & McFarland, Inc. v Kane, 228 AD 396, 398 (4th Dept 1930) ("Neither can the statements complained of be made the basis of an action in fraud, if they are nothing more than a recommendation of the plaintiff's wares. It is common knowledge that dealers are wont to put the best side out, and extol their goods. The public is so familiar with dealer's talk' that it is generally regarded as a mere expression of opinion, and, where the parties deal on equal terms, is not relied upon to any great extent."). Since scienter is not properly pleaded, Redwood is entitled to dismissal for failure to state a claim. Accordingly, it is 
ORDERED that the motion by defendants Sea Fibre Networks Ltd and Diane Hodnett to dismiss the Amended Complaint is granted on the ground of forum non conveniens on condition that said defendants file a stipulation submitting to the jurisdiction of the Irish court and waiving the statute of limitations defense within 10 days of the entry of this order on the NYSCEF system; and it is further
ORDERED that the motion by defendants Redwood Capital Group, LLC and RCG, LLC to dismiss the Amended Complaint for failure to state claim is granted; and it is further
ORDERED that the Clerk is directed to enter judgment accordingly.
Dated: July 19, 2016
ENTER:
__________________________
J.S.C.



Footnotes

Footnote 1:References to "Dkt." followed by a number refer to documents filed in this action in the New York State Courts Electronic Filing (NYSCEF) system.

Footnote 2:As discussed below, the court does not assess the materiality of the alleged representations. That said, Celtix's claim that SFN represented that it had particular clients is clearly refuted by the documentary evidence, which demonstrates that SFN was merely representing its progress in soliciting prospective clients. SFN never represented in the offering materials, for instance, that Verizon was an actual client. As part of its due diligence, Celtix was free to contact these clients to assess their actual interest. Celtix does not claim to have done so.

Footnote 3:It should be noted that, even assuming the meeting occurred as alleged by Martin, a forum non conveniens determination need not, unlike a personal jurisdiction inquiry, turn on a single transaction in New York. See Kreutter v McFadden Oil Corp., 71 NY2d 460, 467 (1988) (CPLR 302(a)(1) "is a single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted").

Footnote 4:The AC contains a separate cause of action for negligence against Redwood, but since the alleged negligence is no different than the alleged negligent misrepresentation, the court finds these claims to be duplicative. As discussed herein, Redwood's only duty to Celtix was to not make a material misrepresentation with scienter.
Footnote 5:The parties assert myriad inaccurate choice of law propositions too numerous to discuss in detail without straying far afield from the relevant issues on this motion. One point is worth noting, namely, that the parties do not discuss if the residence of an LLC's members or if the LLC's state of incorporation or state in which it does business matters most. Given the ubiquity of LLCs in modern commerce, the lack of adequate briefing and the non-necessity to make such a ruling, the court will not rule on this choice of law issue.
Footnote 6:It should be noted that Celtix cites no case holding that an investment bank pitching a deal to potential investors has a fiduciary duty to those investors.

Footnote 7:While there is scant New York state appellate case law on pleading scienter, the pleading standard in federal court is well established. See, e.g., In re Tower Grp. Int'l, Ltd. Secs. Lit., 2015 WL 5813393, at *6 (SDNY 2015) (collecting cases); see also Saltz v First Frontier, L.P., 485 FApp'x 461, 464 (2d Cir 2012) (noting that Second Circuit has "consistently rejected" notion that pleading "generic motive" to earn fees may be used to infer scienter).

Footnote 8:Since the subject warranties are contained in the Shareholders Agreement, a claim for breach of those warranties, a breach of contract cause of action, is governed by Irish law. Cf. CBS Inc. v Ziff-Davis Pub. Co., 75 NY2d 496, 503 (1990) ("The critical question is not whether the buyer believed in the truth of the warranted information [but] whether [it] believed [it] was purchasing the [seller's] promise [as to its truth] The express warranty is as much a part of the contract as any other term. Once the express warranty is shown to have been relied on as part of the contract, the right to be indemnified in damages for its breach does not depend on proof that the buyer thereafter believed that the assurances of fact made in the warranty would be fulfilled. The right to indemnification depends only on establishing that the warranty was breached.") (citations and quotation marks omitted). 

Footnote 9:The court also has no occasion to reach its other arguments, such as whether the AC sufficiently pleads loss causation.